In re James R. SIMMONS, Debtor.

Charles W. GRANT, Trustee, Plaintiff,

v.

James R. SIMMONS, Defendant.

BARNETT BANK OF SOUTH FLORIDA, N.A., Plaintiff,

v.

James R. SIMMONS, Defendant.

Bankruptcy No. 88–595–BKC–3P7.

Adv. Nos. 88–198, 88–145.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

April 16, 1990.

Ronald L. Bergwerk, Jacksonville, Fla., for plaintiff Charles W. Grant, trustee.

Karen S. Jenneman, Jacksonville, Fla., for plaintiff Barnett Bank of South Florida, N.A.

Thomas F. Egan, Orlando, Fla., for defendant.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

Barnett Bank of South Florida, N.A., ("Barnett Bank") and Charles W. Grant, trustee, ("Trustee") filed separate adversary proceedings pursuant to 11 U.S.C. § 727, objecting to the discharge of the debtor, James R. Simmons. These adversary proceedings were consolidated for trial, which was held on November 30, 1989, and January 14, 1990. Upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

The defendant is a financially sophisticated debtor. He has extensive education in business administration and has owned or controlled at least sixteen corporations. His business dealings have involved multi-million dollar transactions, frequently with minimal documentation. The 1986 tax return reported income of $610,000.

In May of 1986, the defendant supplied Barnett Bank with a financial statement showing a net worth of $6 million. A financial statement was also provided to Investors Savings Bank of Richmond, Virginia ("Investors"), in May of 1987. The statement supplied by Investors reported holdings of $420,000 in real estate, $1,308,664 in cash, $137,000 in jewelry, gold, furniture and art and $65,000 in income from investments. Investors verified the existence of at least $988,000.

During the entire 1986 year, the defendant never had less than $100,000 in his personal checking account. His balance on November 30, 1986, was $610,000. However, the next month, during the period he was being sued by various creditors, the defendant concluded that he "no longer needed a depository relationship" and closed his checking account. He has not maintained any bank accounts since that time.

During this same period, the defendant sold at least $90,000 in jewelry and gold coins. He testified that he received the money in cash, placed it in his briefcase and used the money for expenses.

In June of 1986, the defendant transferred $1 million to Faustina, N.V. for an option to purchase real estate. The option expired unexercised.

Also in 1986, the defendant wrote several checks to Jean Ralston; Faustina, N.V., a Netherland Antilles corporation; and Fresh Farms.

The defendant filed a voluntary Chapter 7 petition on March 24, 1988. The schedules listed property totaling $80,932, consisting of an $80,000 condominium encumbered by a $75,000 mortgage and $932 in personal property.

The plaintiffs filed these adversary proceedings objecting to the defendant's discharge alleging failure to keep records, inability to explain loss of assets, and for false oaths.

There are no banking records, ledgers, receipts, invoices, cancelled checks, money order receipts or any other documents from which the defendant's personal financial condition or business transactions can be derived.

The defendant has no records concerning the $90,000 he kept in his briefcase. He testified that most of this money went to pay legal fees and child support. This testimony was contradicted by evidence from his attorney's trust account showing payments of $33,000, not $63,000 that the defendant testified to paying. His testimony is also suspect when he stated that he was obligated to pay $12,000 per year in child support but could not remember if he had paid the two previous years.

At trial the defendant testified that he did have receipts explaining the expenditure of the cash, but, they had been stolen in the burglary of his condominium in May, 1987. The Court finds this to be a midnight fabrication for the following reasons:

(i) At his court supervised deposition, which occurred after the alleged theft, the defendant said nothing about stolen records but affirmatively stated that he kept no records.

(ii) In the report filed with the police concerning the burglary, there was no mention of financial records.

(iii) In an affidavit filed in this case, the defendant did not indicate that any records had been stolen.

(iv) In another affidavit, the defendant stated that all existing records had been turned over to the trustee, again not mentioning any loss of records due to burglary.

(v) When the trustee's appraiser first attempted to inspect the defendant's homestead, there was no mention of a burglary. Only after several attempts to schedule the appraisal, and upon arrival of the appraiser at the homestead, did the defendant produce information regarding the burglary.

When questioned about the approximately $1.3 million in cash listed in the Investors statement, the defendant asserted his Fifth Amendment privilege against self-incrimination.

When questioned about the Ralston, Faustina, and Fresh Farms payments, the defendant contended that he had no idea who the principals of the Faustina, N.V. were, but only that he had an oral contract for the payment of $17,000 per month. He also stated that he did not know what Fresh Farms was or what it did, but that the $15,000 payment to them was part of the Faustina agreement.

The defendant paid over $400,000 to Jean Ralston. Although Ralston was the registered agent of one of his corporations, and he had business dealings with her for over ten years, the defendant had no address or telephone number for her and could only speculate that she might be in New Orleans.

A great deal of this trial has dealt with contradictory statements attributed to the defendant and other witnesses. For example, during his court-supervised deposition, the defendant testified that he maintained a post office box for the receipt of unsolicited mail:

Q: Why are you maintaining a post office box in Orlando?

A: Because I get alot [sic] of magazines, unsolicited magazines, and things of that nature, so I keep it that way.

Exhibit 41, p. 64. (Transcript of Court supervised deposition taken of the defendant.)

In fact, the evidence at trial demonstrated that the defendant used the post office box to conduct and conceal his business and personal finances. This post office box was used by the defendant for corporate filings, receipt of account reports from E.F. Hutton, receipt of billing statements from Bay Hill Country Club, and return addresses on money orders signed by Kimberly Kanago (a close friend and business associate).

In further testimony about the Bay Hill Country Club membership the defendant testified:

Q: Do you have a membership there?

A: No. I used to have it, but I do not have one there.

. . . . .

I believe my ex-wife—she had one. I don't know if she still has it now or not. Exhibit 41, pp. 68–69.

The evidence at trial revealed that two weeks prior to the court supervised deposition, the defendant had received a bill from Bay Hill dated December 31, 1988, which included charges for which he had signed at the Bay Hill Pro Shop.

In his September 15, 1989, affidavit, the defendant attested that, from December 1986, until filing the petition, he:

has been unable to engage in his profession of real estate development and construction due to pending claims of creditors against him ... and was not engaged in regularly conducted business activity and conducted business activities, if at all, only with the various corporations and selling personal assets.

However, at trial the testimony of Kenneth Vandewater (an employee of Investors) and Kimberly Kanago demonstrated that the defendant was engaged in real estate development well into 1987.

## CONCLUSIONS OF LAW

### Failure to Keep Records

■ 11 U.S.C. § 727(a)(3) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

. . . . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

By the defendant's own admission, there are no banking records, ledgers, receipts, invoices, cancelled checks, money order receipts or any other documents from which the defendant's personal financial condition or business transactions can be derived.

The leading case in this circuit concerning the denial of a discharge for insufficiency of records is *In re Chalik*, 748 F.2d 616 (11th Cir.1984). In that case, the debtor had received $130,000 eleven months prior to the petition. At a trial objecting to his discharge, the debtor testified that he only received $70,000 in new money of which he invested approximately $50,000–$60,000 in two now-defunct corporations with which he was involved and spent the remaining $10,000–$20,000 on living expenses. He presented no documentation to support his testimony. The Eleventh Circuit, in affirming the denial of discharge, held that a "satisfactory explanation must consist of more than a vague, indefinite and uncorroborated hodge-podge of financial transactions." *Id.* at 619. See also, *In re Sowell*, 92 B.R. 944 (Bankr.M.D.Fla. 1988); *In re Goff*, 495 F.2d 199 (5th Cir. 1974).

In *Matter of Escobar*, 53 B.R. 382, 384 (Bankr.S.D.Fla.1985), the court denied a discharge stating: "Through the simple expedient of not keeping proper records and not remembering transactions, the debtors have frustrated the trustee's efforts in discovering and valuing assets for the benefit of the creditors."

Likewise in this case, the defendant has effectively barred the trustee and his creditors from verifying the existence of assets through his lack of records and knowledge regarding significant financial transactions. Pursuant to 11 U.S.C. § 727(a)(3), the defendant is not entitled to a discharge.

### Failure to Explain Loss of Assets

11 U.S.C. § 727(a)(5) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

. . . . .

(5) the debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities....

■ The Bankruptcy Code is clear in requiring a debtor to account for the loss of his net worth. *In re Moore,* 89 B.R. 935 (Bankr.M.D.Fla.1988). This accounting requires more than undocumented, unsupported vague generalities in explaining the loss of assets. An explanation must convince the court of the debtor's good faith and businesslike conduct. *In re Pisano,* 105 B.R. 125, 128 (Bankr.S.D.Fla.1989) (quoting *In re Chalik, supra*).

■ This Court agrees with the Bankruptcy Court for the Southern District of Florida that

[t]he standard by which explanation is measured is one of reasonableness or credibility ... one that does not arouse suspicion that the facts are other than those presented by the debtor.

*In re Bernstein,* 78 B.R. 619, 623–24 (S.D.Fla.1987).

■ When questioned about the approximately $1.3 million in cash he reported having in his financial statement to Investors, the defendant asserted his Fifth Amendment privilege against self-incrimination.

■ The Court draws a negative inference from the defendant's Fifth Amendment assertion. *See, Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *In re South Florida Title, Inc.,* 102 B.R. 266, 268 (Bankr.S.D.Fla.1989).

Even without the negative inference, the explanations offered by the defendant have left this Court far from satisfied regarding the defendant's good faith, indeed, the explanations offered arouse nothing but suspicion surrounding the defendant's conduct. Pursuant to 11 U.S.C. § 727(a)(5), the defendant is not entitled to a discharge.

### False Oaths

■ 11 U.S.C. § 727(a)(4) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

.    .    .    .    .

(4) the debtor knowingly and fraudulently, in or in connection with the case—
(A) made a false oath or account....

This Court has previously held that a debtor's fraudulent intent can be inferred from false and misleading testimony given in his case. *In re Topping,* 84 B.R. 840 (Bankr.M.D.Fla.1988). This proceeding is riddled with false and misleading statements made by the defendant, effectively obscuring the true disposition of the assets of the estate.

The subject matter of a false oath has been determined to be "material" if it bears a relationship to the debtor's estate, or concerns the discovery of assets, or the existence and disposition of his property. *In re Kindorf,* 105 B.R. 685, 690 (Bankr.M. D.Fla.1989).

The Court finds that the defendant knowingly and fraudulently made material false oaths in his schedules, affidavits, deposition and trial testimony, and pursuant to § 727(a)(4)(A) is not entitled to a discharge.

### CONCLUSION

Discharges are for honest debtors. The essence of bankruptcy is that debtors come before the Court, surrender their non-exempt assets, and in return receive a discharge from scheduled debts. *In re Moore,* 104 B.R. 473, 475 (Bankr.M.D.Fla. 1989). The conduct of the defendant must result in a forfeiture of the discharge.

A final judgment will be separately entered denying the discharge of the debtor.