**In re Marco LEVY, Debtor.**

**ATTORNEY GENERAL OF QUEBEC, Plaintiff,**

**v.**

**Marco LEVY, Defendant.**

**Bankruptcy No. 95–22861–BKC–PGH.**
**Adversary No. 95–1597–BKC–PGH–A.**

United States Bankruptcy Court,
S.D. Florida,
Fort Lauderdale Division.

March 27, 1998.

Steven R. Brownstein, Coral Gables, FL, for Debtor.

Lucy C. DiBraccio, Hollywood, FL, Trustee.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

This matter is before the Court upon the complaint of the Province of Quebec ("Quebec"), which seeks the denial of a discharge to Marco Levy ("Debtor"), and upon the objections lodged by Quebec and Lucy C. DeBraccio ("Trustee") to the Debtor's claimed exemptions.

Both matters having been consolidated for trial on the merits, a hearing took place on May 20 and 21, 1997, in Miami, Florida. The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (J), and the Court has jurisdiction to enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

For the reasons stated below, the Court denies the Debtor's discharge and sustains the objections to claims of exemption.

### FACTS

The Debtor and his wife, Jacqueline Levy, are citizens of Canada currently living in Florida. They have one child, Julie Levy. The Debtor formerly resided in Quebec where, through various corporations, he operated a business of storing and disposing of hazardous waste, particularly polychlorinated biphenyls ("PCB's"). Following an explosion and fire on the night of August 23, 1988, at the PCB storage facility at St. Basile, Quebec, Canada, the Debtor fled to Florida where he and his family have remained ever since.

In 1994 a Canadian court rendered judgment in favor of Quebec and against the Debtor for the sum of $17,031,474.87 (Canadian)[1] for the costs incurred by the govern-

---

1. All monetary sums in this opinion are expressed in terms of United States currency unless otherwise specified. The exchange rate as of

ment for an environmental clean-up of the St. Basile site after the fire. On July 20, 1995, Quebec filed a complaint in the United States District Court for the Southern District of Florida to register its judgment against the Debtor. On July 26, 1995, the Debtor petitioned for relief under the provisions of chapter 7 of title 11 of the United States Bankruptcy Code. Thereafter, objections to the Debtor's claimed exemptions were filed September 27, 1995, by the Trustee and on October 30, 1995 by Quebec. Finally, on November 29, 1995, Quebec filed its complaint objecting to the Debtor's discharge.

## THE ALLEGATIONS

Count I of Quebec's complaint objecting to discharge alleges that the Debtor failed to keep and maintain recorded information from which his financial condition could be ascertained in violation of 11 U.S.C. § 727(a)(3) and that the Debtor failed to file his tax returns and provide them to the Trustee in violation of 11 U.S.C. § 727(a)(4)(D). Count II alleges that the Debtor made false oaths in depositions and testimony in this case concerning his activities in 1985 through 1987 in violation of 11 U.S.C. § 727(a)(4)(A). The Debtor is also accused of making a false claim of exemptions in violation of 11 U.S.C. § 727(a)(4)(B). Count III alleges that the Debtor failed to satisfactorily explain a loss of assets to meet his liabilities in violation of 11 U.S.C. § 727(a)(5).

Additionally, both Quebec and the Trustee object to the Debtor's claim of homestead and certain personal property exemptions because his immigration status precludes such exemptions under Florida law.

## I

### LACK OF ASSETS TO MEET LIABILITIES

■ Quebec has established that the Debtor's discharge should be denied because he failed to explain satisfactorily a lack of assets to meet his liabilities as alleged in Count III in violation of 11 U.S.C. § 727(a)(5).

■ The plaintiff has the initial burden of proof in establishing that the Debtor has failed to explain a loss of assets. Fed. R.Bankr.P. 4005; *MacPherson v. Shaheen (In re MacPherson)*, 129 B.R. 259, 261 (M.D.Fla.1991). However, once the plaintiff has introduced sufficient evidence of an unexplained absence of assets, the burden shifts to the Debtor to come forward with a satisfactory explanation for the absence. *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir.1983); *Lacy Wholesale & Main Factors v. Bell (In re Bell)*, 156 B.R. 604, 605 (Bankr.E.D.Ark. 1993); *In re MacPherson*, 129 B.R. at 261.

■ A satisfactory explanation is one that convinces this Court. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984); *In re MacPherson*, 129 B.R. at 261. Some type of believable, direct evidence will be required to defeat an objection based on failure to explain a loss of assets. *Hawley v. Cement Industries, Inc. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir.1995); *In re MacPherson*, 129 B.R. at 261; *Wortman v. Dwyer (In re Ridley)*, 115 B.R. 731, 737 (Bankr.D.Mass.1990); 6 *Collier on Bankruptcy* ¶ 727.08 (Lawrence P. King et al. eds., 15th ed. rev.1997). The question of whether a debtor satisfactorily explains a loss of assets is a question of fact. *In re Chalik*, 748 F.2d at 619.

In 1984 the Debtor obtained a visa to live in the United States, purportedly to start a business. The parties stipulated that during the period 1984 through 1988 the Debtor transferred to accounts in the United States the sum of $436,980.00 from Canadian bank accounts maintained by the Debtor and his companies.

Quebec's expert witness, who analyzed invoices of the Debtor's companies and financial statements produced by Levy, testified that in his opinion, at least $200,000.00 of income was not reported during the period in the 1980s when the Debtor was operating his Canadian facilities. The expert witness further testified that the companies had a net worth of more than $900,000.00 (Canadian) as of October 1987. The parties stipulated that

February 1997 was 1.3556 Canadian dollars per    one United States dollar.

one of the Debtor's companies, NCD, had made loans totaling $795,000.00 to certain of the Debtor's other companies as of 1987 and that the Debtor cannot explain the disposition of the proceeds of those loans.

## A. The Pompano Beach House

On May 10, 1985, the Debtor, who apparently vacationed during a portion of each year in Florida with his family, purchased a residence in Pompano Beach, Florida, making a cash payment of $232,000.00 on the total purchase price of $270,000.00. The Debtor was earning between $16,000.00 and $30,000.00 a year at the time he purchased the home. In explaining the Pompano Beach transaction, the Debtor at first admitted that the cash payment was partially funded by the $436,980.00 he had transferred from Canada. The Debtor's sworn pre-trial direct testimony was that the down payment was "funded with money borrowed from Lubrimax U.S.A., a company which I owned and controlled." (Def.'s Ex. nn at 2.)

However, the Debtor later stated that his mother and his wife each provided a portion of the down payment for the Pompano Beach home. Contrary to the Debtor's assertion, Mdm. Levy testified that she did not advance her son any money in connection with the purchase of the Pompano Beach property. Supporting Mdm. Levy's testimony is Plaintiff's Exhibit 54, a hand-written list she prepared which purports to show the loans she made to her son by date and amount and which demonstrates that the first loan documented was for the sum of $1370.00 on June 2, 1989, some four years after the purchase

of the home. The Debtor's wife, Jacqueline Levy, testified at her deposition that she did not know where the money came from to purchase the house in Pompano Beach, and she professed not to know if she put her money toward the purchase price. (Pl.'s Ex. 64 at 50–51.)

Other evidence concerning the 1985 purchase of the Pompano Beach property was the Contract of Sale dated April 5, 1985, stating that a cash deposit of $24,000.00 was due within ten days from April 5, 1985, and that closing was to take place on or about May 10, 1985. Several of Quebec's exhibits reflect that substantial sums of money, sometimes in cash, were moved in and out of four of the Debtor's bank accounts at Glendale Savings and Loan in Pompano Beach, Florida, between April 15 and May 10, 1985.[2]

On June 18, 1987, the Debtor sold the Pompano Beach property for $327,000.00 and received net proceeds from the sale of $259,-797.24. The proceeds were deposited into account number 018–600950–4 on June 18, 1987, in the Debtor's name at Glendale Savings. (Pl.'s Ex. 38.) When asked in his deposition to account for the $436,000.00 transferred to the United States, apart from the funds used to purchase the Pompano Beach house, the Debtor replied that the money was "spent or returned to Canada, if some of the money returned.... I don't remember." (Tr. at 115.) The Debtor's direct testimony at trial on this subject was that he had supplied documents explaining that the missing funds were used for expenses incurred by Lubrimax, U.S.A. But Lubrimax, U.S.A., which the Debtor testified

**2.** Plaintiff's Exhibit 21 documents a wire transfer of $101,591.40 on April 15, 1985, from a bank account in Canada in the name of Lubrimax to an account opened at Glendale in the name of Marco Levy or Jacqueline Levy d/b/a Lubrimax, U.S.A., Inc., account number 18–0004728–3–09 ("Account One"). Plaintiff's Exhibit 22 reflects another wire transfer on April 15 of $35,000.00 from a Canadian account in the name of Marc Levy to an account opened at Glendale in the name of Marc Levy or Jacqueline Levy, account number 18–0004606–1–09 ("Account Two"). A third wire transfer from a Canadian account to the account of Marc or Jacqueline Levy d/b/a NCD, account number 18–0004729–1–09 ("Account Three") was indicated by a deposit on April 15 in the sum of $109,554.03.

On April 17, 1985, the Debtor made a cash withdrawal of $25,000.00 from Account Two. On May 10, 1985, the closing date for the Pompano Beach house, a bank statement for Account Two shows that the sum of $200,000.00 in cash was deposited and the sum of $205,000.00 in cash was withdrawn. Also on May 10, $95,-000.00 in cash was withdrawn from Account One and $105,000.00 in cash was withdrawn from Account Three. Finally on May 10, the fourth account, number 18–0004889–9–03 in the name of Jacqueline Levy or Mark Levy, reflects that $205,000.00 in cash was deposited in this account and $191,530.37 in cash was withdrawn the same day.

was intended as an oil reclamation operation, never functioned in that capacity.

### B. Transfers after the Fire

#### 1. Transfers to tenants by entireties accounts

The fire at the Debtor's PCB storage facility occurred on the night of August 23, 1988, and the morning of August 24, 1988. A few hours after the fire the Debtor fled to Florida, and shortly thereafter he closed the Canadian bank accounts on many of his companies. On September 1, 1988, the Debtor closed Account Number 018–600950–4 at Glendale which was in his name alone, withdrawing $260,000.00, and he opened a new account at Glendale, Account Number 018–601690–5, in his and his wife's names as tenants by the entireties in the sum of $211,000.00. On the same date the Debtor opened another account for $50,000.00 in his and his wife's names as joint tenants by the entireties in trust for their daughter, Julie Levy, who was 13 years old at that time.

Although the Debtor testified that the $50,000.00 placed in trust represented the proceeds from the sale of the Pompano Beach property, he previously stated at his deposition that $50,000.00 was placed in trust for his daughter because the money was given to the Debtor by his mother. However, the Debtor's mother testified at her deposition that she did not lend any money to the Debtor in connection with the purchase of the Pompano Beach property in 1985. (Tr. at 128.) Further, the Debtor's sworn statement was that his mother did not advance him any money until June 1989, although his subsequent testimony was that his mother had lent him money prior to 1989. Also, Plaintiff's Exhibit 54, the purported itemization of loans to the Debtor from his mother, shows that the first loan was not made until June 2, 1989, and that there is no $50,000.00 loan on the list.

#### 2. Transfers to Semet, Lickstein

In a series of transactions between September 1988 and February 1989, the Debtor transferred money to his attorney's law firm, Semet, Lickstein, Morgenstern, Berger, Friend, Brooke & Gordon P.A. ("Semet, Lickstein"), in the total sum of $220,000.00.[3] (Pretrial Order, Undisputed Fact 37; Tr. at 134.) The Debtor testified at his deposition that the transferred funds were for purposes of a retainer, and at the trial he stated, "That money has been put in that account because we were expecting pretty fantastic lawsuits from persons, from particulars, and anybody that did not realize finally [sic]." (Tr. at 134–35.)

However, a representative of the Semet, Lickstein law firm testified in a sworn deposition that, although he could not disclose the reason for the deposit because of the attorney-client privilege, he could state that, "Semet, Lickstein did not demand the deposit of the money, did not require the money as a retainer, and did not anticipate that Levy would incur legal fees in the amount of $220,000.00." (Tr. at 135.) Approximately $40,000.00 of the money transferred to Semet, Lickstein was from the so-called trust account the Debtor and his wife maintained for their daughter, Julie.

#### 3. Transfer to Mdm. Levy

In January 1991, at the Debtor's instruction, Semet, Lickstein made a check payable to Lubrimax U.S.A., one of the Debtor's corporations, for $140,000.00. The Debtor, when asked whether the money was a loan from Lubrimax, stated:

A. I think at that particular point I would say.

THE COURT: You would say what?

THE WITNESS: That Lubrimax lent me the money, the $140,000 at that particular point. The money coming from the house, I mean, it went back into Semet, Lickstein and the other payment, back and forth.

The money came back for the simple reason that the government of Quebec didn't bring—appeared in the newspapers, didn't bring any charges about fraud or

---

**3.** The transfers included the following transactions: $6500.00 on September 12, 1988; $5000.00 on October 25, 1988; $170,000.00 on December 15, 1988; and $40,000.00 on February 17, 1989.

anything, so the major concerns were passed.

(Tr. at 144–145.)

Thereafter, in the same month, the Debtor transferred $140,000.00 to his mother. The Debtor testified in a deposition that this transfer was to partially repay loans of approximately $180,000.00 borrowed from his mother from August 1988 through 1991. However, in the pre-trial brief submitted by the Debtor, he claimed that as of January 1991 his mother's loans totaled only $78,-000.00. The Debtor admitted that in transferring the $140,000.00 to his mother he overpaid her by some $60,000.00, at a time when he was earning no income.

The Debtor also acknowledged that the loans he received from his mother were accomplished by his withdrawal of various amounts from her savings account and that Mdm. Levy never made the withdrawal herself. Neither the Debtor nor Mdm. Levy knew the whereabouts of the passbooks documenting these transactions. The Debtor's mother's handwritten list of the loans to the Debtor beginning on June 2, 1989, corroborates neither the Debtor's deposition nor his trial testimony, reflecting loans totaling only $51,880.00 through January 1991. See Plaintiff's Exhibit 54.

Between January 1991 and the end of 1994 the Debtor received more so-called loans from his mother by withdrawing funds from her savings account. Mdm. Levy is an elderly woman who lives on a modest retirement income funded mainly by government pensions. The Debtor presented no evidence such as tax returns, bank statements, or brokerage account statements to demonstrate how Mdm. Levy could afford to lend hundreds of thousands of dollars to her son. In his bankruptcy schedules, the Debtor has listed his mother as a nonpriority, unsecured creditor with a claim of $185,000.00. The only other nonpriority, unsecured claims are held by Lubrimax U.S.A. for $140,000.00 and Quebec for $17,031,474.87.

### 4. Transfer to Purchase Cooper City Dwelling

The Debtor testified that in October 1991 he purchased a personal residence in Cooper City, Florida, for a total purchase price of $190,000.00. At purchase, the property was subject to a mortgage debt of $94,000.00, since reduced to approximately $70,000.00. The Debtor claimed that the $100,000.00 balance of the purchase price was furnished in cash by a loan from his mother. The Debtor's wife did not contribute any money toward the purchase of the residence in Cooper City. According to the bankruptcy schedules, the Debtor's monthly mortgage payment is $1726.00 per month. At the time the Debtor purchased the Cooper City property neither the Debtor nor his wife was earning any income.

### C. The Debtor's Current Financial Condition

The Debtor's individual income tax returns for 1993 and 1994 were introduced into evidence.[4] The Debtor reports total income earned in the United States of $5473.00 in 1993 and $8474.00 for the year 1994. Notwithstanding the tax returns, the Debtor's schedules reflect that as of the petition date the Debtor was currently earning $3900.00 per month income and was also receiving $1200.00 per month in "loans" from his mother. When the Debtor was asked about the apparent discrepancy, he answered:

A. I think I might have your answer. This statement was on—I think on the last—if I remember well, when I did it, was on the last data available. It wasn't average over a period of time. It was really a—more than a mathematical question, it was, you know, like a recent question, if I remember good.

I would have to go through all this and just calculate the whole thing, but I would believe this was somewhere near the filing date data, not average.

(Tr. at 179.)

The Debtor testified that all of the assets of his Canadian companies were seized on or around August 1988. He stated that he filed

4. The tax returns were not file-marked by the    I.R.S., nor were they signed.

income tax returns for income earned in the United States for the years 1993 and 1994 a couple of weeks before the trial, but did not file personal income tax returns for the years 1987 through 1992 because he did not earn sufficient income to require the filing of a return. The Debtor's wife testified that she has not been employed since 1988.

According to the Debtor's schedules, on the date the petition was filed he owned property consisting of $50.00 cash on his person and $50.00 in a checking account, a ten-dollar watch, a $650.00 Cadillac, $850.00 worth of rebuilt computer components, and a personal residence. The Debtor and his family reside in a dwelling valued at $194,000.00 in Florida with a monthly mortgage payment of $1726.00. The Debtor does not claim to own any other assets such as household furniture or other accouterments normally associated with the standard of living apparently enjoyed by the Debtor and his wife and child.[5] His wife has had no income, with which to purchase any assets. The Debtor's mother and wife could not remember much, if anything, about their own assets.

In summary, the evidence in this case points to one inescapable conclusion: the Debtor had substantial assets when in Canada; he got in financial trouble, moved to Florida, and most of his assets have disappeared. Missing or unaccounted for are assets and income from the Debtor's Canadian companies, a portion of the $436,000.00 admittedly transferred to the United States, and some $795,000.00 (Canadian) in loans from NCD to the Debtor's companies.

Furthermore, the Debtor's explanation of the alleged loans from his mother is unsatisfactory. The Debtor admitted he did not owe Mdm. Levy the $140,000.00 "repayment" when he made it, and he never adequately demonstrated how his mother, an elderly retiree with a modest income, could afford such loans in the first place.

The Debtor has attempted to insulate traceable assets from the claims of Quebec, the principal creditor, through tenancy by the entireties accounts, his law firm's trust account, his mother's bank account, and the purchase of the Cooper City residence, but has offered no satisfactory explanation as to why or how the bulk of the income and assets of his many companies have disappeared. The Debtor's version of why he has no assets consists of a mass of indecipherable documents and sworn testimony that is contradictory and in general not worthy of belief. Having failed to satisfactorily explain a lack of assets to meet liabilities, the Debtor's discharge is denied pursuant to 11 U.S.C. § 727(a)(5).

## II

## THE OTHER ALLEGATIONS

The evidence in support of the allegations contained in Counts I and II is not sufficient to support denial of discharge, and they are dismissed. Because the Court finds that the Debtor's discharge should be denied under Count III, a detailed discussion of the other allegations is unwarranted.

## III

## THE REAL AND PERSONAL PROPERTY EXEMPTIONS

■ The Debtor's original schedules claimed the following exemptions in accordance with the provisions of Article X, Section 4(a)(1)–(2) of the Constitution of the State of Florida: his residence at 5760 SW 88 Avenue, Cooper City, Florida, and $1000.00 in unidentified personal property. Additionally, the Debtor claimed his car as exempt pursuant to Florida Statute Annotated section 222.25.

Both Quebec and the Trustee objected to the exemptions on several grounds, including the fact that the Debtor is a non-immigrant alien and therefore not entitled to the homestead exemption under Florida law. *See In re Boone,* 134 B.R. 979, 981 (Bankr.M.D.Fla. 1991) (holding that aliens in the United States on temporary rather than permanent visas cannot in good faith formulate the requisite intent to make the subject property a

---

5. For a period of years, the Debtor's daughter was enrolled in a private school for learning disabilities in Florida, which was an additional expense to the Debtor.

permanent homestead); *In re ·Gilman,* 68 B.R. 374, 375 (Bankr.S.D.Fla.1986) (same).

The Debtor has since amended his schedules to add the following claim:

> In addition, the homestead property is owned by the Debtor and his wife as tenants by the entireties. Under 11 U.S.C. § 522(b)(2)(B) any interest in property in which the Debtor had immediately before commencement of the case an interest as tenants by the entireties to the extent that such interest is exempt from process under applicable non-bankruptcy law, is exempt in bankruptcy.... [T]enancy by the entireties property is immune from the claims of creditors of one spouse only. Here, the *only* joint creditor is the mortgagee on the house, and the mortgage is current; thus, there is no creditor into whose shoes the Trustee could step in an effort to liquidate the property. A recent, well reasoned decision on the subject is *matter of Anderson,* 132 B.R. 657 (Bankr. M.D.Fla.1991) wherein Judge Bains held that: (a) there must be a joint creditor and (b) the joint creditor must have capacity to have a process issue. Here, the mortgage is current and there is no joint creditor with capacity to have process issue. Accordingly, ... the entireties property in question is immune from process and therefore beyond the reach of the trustee.

(Debtor's Amendment to Schedules, November 29, 1995.)

The Debtor's immigration status is relevant to determine eligibility for the claimed exemptions. As previously stated, the Debtor and his wife are Canadian citizens and were Canadian citizens when the Debtor filed his bankruptcy petition. At all relevant times, the Debtor's wife's status in the United States is that of an undocumented alien.

The Debtor is currently in the United States under the auspices of an H–1B Visa obtained on his behalf by Dynamic Computers, an entity he owns and controls. The application for this visa classifies the Debtor as a "non-immigrant" and states that intended employment is for the period January 2, 1994 to January 2, 1998. (Pl.'s Ex. 19.) A letter dated December 8, 1994, in support of the petition states that Dynamic Computers, Inc. proposes to employ the Debtor "on a temporary basis in the United States...." (Pl.'s Ex. 19.) Prior to 1994, the Debtor was in the United States under a visa petitioned for by Lubrimax U.S.A., Ltd., another of the Debtor's companies. The United States Department of Justice, Immigration and Naturalization Service granted the petition to classify the "non-immigrant" Debtor as "temporary W." (Pl.'s Ex. 19.)

The facts regarding the ownership of the residence are also relevant to the parties' arguments. The Debtor schedules Murray Mortgage Company as the only creditor to whom the Debtor and his wife are obligated jointly. This creditor's claim of $71,000.00, according to the Debtor's schedules, is secured by a first mortgage lien on the Debtor's homestead. The Debtor's only other scheduled creditors are Quebec, the Debtor's mother, and one of the Debtor's corporations, Lubrimax, U.S.A., Ltd.

In attacking the Debtor's entireties argument, counsel for the Trustee and Quebec vigorously contend that the indebtedness owed to the Debtor's mother is a joint obligation because the Debtor used the funds for the joint benefit of the Debtor and his wife and that the Debtor's interest in the entireties property may thus be reached through this joint debt.

However, the record does not support such a contention. The testimony by the Debtor and Mdm. Levy that the loans from Mdm. Levy were to the Debtor alone were not refuted by evidence to the contrary. Thus, the question remains whether the Debtor may avail himself of bankruptcy relief without having to subject his most valuable asset to the claims of all his creditors. Or, as Chief Judge Cristol framed the issue, "May a Debtor eat smorgasbord or must the Debtor coming to the bankruptcy table eat the entire meal." *In re Planas,* 199 B.R. 211, 212 (Bankr.S.D.Fla.1996).

The extent to which a debtor may exempt real property owned as tenancy by the entireties with a non-debtor spouse is a divided question among the courts that have struggled with the issue. *See,* Stephen B. Chaneles, *Tenancy by the Entireties: Has the*

*Bankruptcy Court Found a Chink in the Armor?*, Fla.B.J., Feb. 1997, at 22; Judge Frank W. Koger, *The Fiction is Fractured: Bankruptcy Breaks Entireties*, J.Mo.B., Oct.–Nov.1992 at 507.

The Court finds it unnecessary to probe the depths of the tenancy by the entireties issue in this case for one simple reason: the Debtor may not use *any* state exemptions afforded by Florida law because at all relevant time periods the Debtor resided in the United States pursuant to a temporary visa. This fact prevents the Debtor from establishing domicile within the state which in turn precludes the Debtor from availing himself of the state exemptions.

The statute applicable to a determination of these issues provides in part:

(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in ... paragraph (2) of this subsection.... Such property is—

(2)(A) any property that is exempt under ... State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place; and

(B) any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety ... is exempt from process under applicable nonbankruptcy law.

11 U.S.C. § 522(b)(2)(A) & (B) (1994).

■ Thus, under section 522(b)(2)(A) and (B), the state law that determines the state exemption to which a debtor may be entitled is the law of the debtor's *domicile* for the 180 days immediately preceding the filing of the petition or for a longer portion of such 180–day period than in any other place. Here, "domicile" means actual residence with a present intention to remain there. *Morris v. Gilmer*, 129 U.S. 315, 328–29, 9 S.Ct. 289, 293, 32 L.Ed. 690 (1889); *4 Collier on Bank-*ruptcy ¶ 522.06 (Lawrence P. King, et al. eds., 15th ed. rev.1997). Non-immigrant aliens in the United States on temporary rather than permanent visas are incapable of formulating the requisite intent to establish a permanent residence. *Cooke v. Uransky (In re Cooke)*, 683 F.2d 130, 131 (5th Cir.1982); *In re Boone*, 134 B.R. 979 (Bankr.M.D.Fla. 1991); *In re Gilman*, 68 B.R. 374, 375 (Bankr.S.D.Fla.1986); *Cooke v. Uransky (In re Cooke)*, 412 So.2d 340, 342 (Fla.1982). Without the requisite intent, no domicile exists.

■ Under section 522(b), the lack of a domicile in any state within the 180–day period immediately preceding the filing of the petition is fatal to any right of exemption under the laws of the state. *In re Liberman*, 44 F.2d 661, 662 (S.D.Ala.1930). "Hence, one who has domicile in a foreign country during the entire 180–day period cannot claim any exemption under state law...." 4 Collier on Bankruptcy ¶ 522.06 (Lawrence P. King, et al. eds., 15th ed. rev.1997).

Documents in evidence show that when the Debtor filed for bankruptcy on July 26, 1995, he was a Canadian citizen in residence in the United States pursuant to a nonimmigrant visa for purposes of employment "on a temporary basis." (Pl.'s Ex. 19.) Nothing in the record demonstrates that the Debtor had acquired a more permanent type of immigration status during the 180–day period preceding the filing of his bankruptcy petition.

Therefore, the objection to the Debtor's claim of exemption by virtue of Florida law governing this dissolution of tenancy by the entirety and personal property exemption of an automobile is sustained.

IT IS SO ORDERED.