**In re Charles S. CARTER and Ann Christine Carter, Debtors.**

**Carter Engineering Company, Inc., Plaintiff,**

**v.**

**Charles S. Carter, Defendant.**

**Bankruptcy No. 97–16761–DWS. Adversary No. 97–0975.**

United States Bankruptcy Court, E.D. Pennsylvania.

July 21, 1999.

176

Leonard P. Goldberger, Philadelphia, PA, for Carter Engineering Company, Inc.

Thomas J. Maiorino, Philadelphia, PA, for Charles S. Carter.

## MEMORANDUM OPINION[1]

JUDITH K. FITZGERALD,
Bankruptcy Judge.

Before the court is the complaint of Carter Engineering Company seeking to deny Debtor Charles Carter[2] a discharge under the provisions of § 727(a)(2)(A) and § 727(a)(5). In addition, the complaint seeks a declaration that the debt owed by Debtor to Carter Engineering Company is nondischargeable pursuant to the provisions of 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4). For the reasons which follow,

1. This Memorandum Opinion constitutes the court's findings of fact and conclusions of law.

2. Debtor Ann Christine Carter is not a party to this adversary action. Charles S. Carter is referred to throughout as "Debtor" to avoid confusion due to the similarity in his name and that of George William Carter and William Daniel Carter. Debtor is not related to either of the other Carters.

the Debtor's discharge will be denied under § 727(a)(5) and § 727(a)(2)(A).

Based upon the testimony of the witnesses, the following are relevant facts. In 1989, William Daniel Carter and his father, George William Carter, owned Carter Engineering and signed a contract to sell all their stock in their company to C3 Enterprises, Inc. (C3). Although C3 paid part of what it owed, by 1991 it failed to complete the deal, leaving William Daniel Carter unpaid for his 49 percent interest. Debtor was a shareholder in C3 from its beginning. C3 was organized as a holding company to acquire all of the stock of Carter Engineering. C3 had no operations. The other shareholders of C3 at its inception were Thomas Coffey and William Castine.

In 1991, C3 filed a bankruptcy petition in California. To preserve its interest in Carter Engineering, C3 wanted to complete its purchase. The bankruptcy judge required C3 to establish an escrow in an amount sufficient to finish the payments. C3 needed $300,000 for the escrow. Debtor contributed $200,000 from an IRA that he owned and delivered it to C3 for its use in funding the escrow.[3] Debtor knew that in so doing he ran the risk that he would incur penalties for early withdrawal.

Although he testified that he did not demand repayment within the appropriate time period to avoid the penalty, nonetheless, within that time he was repaid. He received a payment of $40,000 (which is not at issue herein) from one of the directors (Castine). In addition, his co-shareholders in C3, which had control of Carter Engineering, caused a wire transfer of $140,000.00 from the account of Carter Engineering to Debtor.[4] The wire transfer took place on or about July 23,

1992. Debtor did not consider this transfer to be a loan. He considered it to be a repayment for the $140,000 escrow contribution.[5] Nonetheless, on or about July 30, 1992, Debtor executed a promissory note on the stationery of Carter Engineering in favor of Carter Engineering for the $140,-000.00 it had transferred to him. The note Debtor executed bore interest at the rate of 9 percent on any unpaid balance but contained no specified date for repayment and, therefore, was payable on demand. Debtor deposited the $140,000.00 into personal accounts and when he had collected all he could, he made a collective deposit back into an IRA account. Before August of 1992, largely as a result of the $140,-000.00 paid to him by Carter Engineering, Debtor replaced his entire IRA account.

The evidence established that there was no corporate purpose for Carter Engineering to have loaned Debtor $140,000.00. In addition, no evidence was produced that its Board of Directors had authorized this transaction which, Debtor concedes, was out of the ordinary course of its business. The evidence established that the only purpose was to repay Debtor for the amount he had taken from his IRA account to fund the escrow C3 needed to could complete its purchase of the stock of Carter Engineering.

Debtor and William Castine testified that they intended at some unspecified time in the future to operate the corporations, Carter Engineering and C3, as though they were one entity. Both Debtor and Castine testified that because of their intent to change the form of business operations in the future, they regarded Debtor's loan to C3 and Carter Engineering's transfer to Debtor as offsetting debts that were legitimate business concerns for both

---

**3.** For reasons unexplained on this record, although the escrow was fully funded, not all of the funds were paid over to William Daniel Carter or his father.

**4.** Debtor was a director of Carter Engineering for a period of time in about June of 1992 through August of 1994.

**5.** At the time of the wire transfer, Carter Engineering did not owe Debtor any money and Debtor owed nothing to the company.

178

corporations. There was no evidence that the corporations were ever merged, or that C3 had any business other than holding the stock of Carter Engineering.

On or about August 3, 1992, C3 signed a note to Debtor for $355,917.78 at 9 percent interest. This note was signed by the other shareholders, Castine and Coffey, allegedly to recognize funds Debtor had previously advanced to C3 over and above the loan from his IRA. C3's bankruptcy apparently did not go well. At the same time, Carter Engineering was losing money. Despite the losses, in February of 1994, Castine and Coffey were authorized bonuses of $160,000 by Carter Engineering's Board of Directors (Coffey, Castine and Derringer) which they assigned to Debtor to offset the debt that Debtor owed to Carter Engineering pursuant to the promissory note dated July 30, 1992. The evidence substantiated that at the time, Carter Engineering was insolvent and Castine and Coffey were not entitled to bonuses. In March of 1994, well within the preference period for the bonuses and assignment, Carter Engineering filed bankruptcy. Debtor testified that he could not state what, if any, consideration he gave to Castine and Coffey in exchange for this assignment.

In August of 1994, William Daniel Carter purchased Carter Engineering from the trustee in bankruptcy. In investigating the finances of Carter Engineering, William Daniel Carter uncovered the fact that the July 23, 1992, transfer of $140,000.00 had been made from Carter Engineering to the Debtor with no corporate purpose. He sued on behalf of Carter Engineering and won a judgment against Debtor.[6] Judgment of $170,264.36 was entered on May 23, 1995, at a time when there was at least $190,000.00 in the Debtor's IRA account.

Beginning in June of 1995 and through September of 1996, Debtor withdrew all but about $55,000.00 from his IRA. He testified that he used some of the IRA disbursements for the tax liabilities incurred for early withdrawal penalties, for personal purposes and for legal fees. Legal fees totaled over $98,000 and have never been fully itemized. He testified that he purchased a very expensive, custom-made stereo cabinet for his home. He was unable to explain the purpose for, or what use was made of, a large percentage of his withdrawal—nearly $55,000.00. Debtor testified that he was unemployed for a brief part of this time and was withdrawing money from his IRA for living expenses. William Daniel Carter points to the surreptitious manner in which Debtor withdrew from the IRA. Although the IRA was in a broker's account, Debtor did not transfer funds to cash or to his own checking account. Rather, he had checks issued to relatives, who then cashed checks on his behalf. Debtor acknowledged that he did the withdrawals this way to avoid Carter Engineering's attachments on his bank accounts.

The evidence substantiated that Debtor systematically dissipated the funds in his IRA to support a lavish life style and to frustrate Carter Engineering's attempt to execute on the judgment it had obtained in May of 1995. By January of 1997 there was essentially nothing left in Debtor's IRA account. Charles Carter filed bankruptcy on June 2, 1997. At his deposition on March 12, 1998, Debtor testified that he never intended to repay the $140,000.00 to Carter Engineering because of what he believed to be appropriate offsetting transactions—i.e., the money that he never recouped from C3.

The parties raise the question whether Debtor was entitled to an exemption in his entire IRA account at the time of the transfers from June, 1995 and forward. If he was, and the asset was totally excluded from collection by creditors, then the fact that Debtor dissipated the funds

6. C-3 also lost a suit it brought against William Daniel Carter (and others) alleging that he had fraudulently inflated the stock price charged for his shares in Carter Engineering.

should not require the court to deny him a discharge for failure to explain the diminution in value of the account and the deficiency in that account to meet his liabilities.

The statute in effect at the time in Pennsylvania concerning retirement and annuity funds was 42 Pa.C.S.A. § 8124(b)(1)(ix)(B). In construing that statute, the Third Circuit wrote in *Barshak v. Shubert*, 106 F.3d 501, 504 (3d Cir.1997): "[The statute] provides that the exemption from attachment and execution (and thus exemption from inclusion in a debtor's bankruptcy estate) 'shall not apply' to amounts 'contributed' by the debtor to a retirement fund in excess of $15,000.00 in a one-year period." In this case, the Debtor withdrew $190,000.00 from his IRA account in 1992 and replaced it before August of 1992. The facts are similar to those in *Barshak*. In *Barshak*, the debtor's employer made contributions on behalf of the debtor into an ERISA qualified Employee Benefit Plan from 1974 to 1989. The debtor's employment ended in 1989 and on September 21, 1992, debtor received a check for $71,134.75 from the Plan. He deposited the check into a personal bank account. On September 30, 1992, he deposited the money into his IRA. On December 30, 1994, Barshak filed a chapter 7. He claimed the IRA as exempt from inclusion in his bankruptcy estate. The court found that the funds in the IRA were not exempt from inclusion in the estate. It determined that when Barshak placed the money in his IRA, his contribution was the same as placing currently earned income into the IRA. No law required him to establish an IRA or to deposit the funds into any other qualified retirement plan. Once he received the $71,134.75 from his ERISA Plan, he could have used it as he saw fit. Thus, his payment was voluntary and added a new asset to the IRA. In addition, the status of the money changed when the Debtor gained control of its use and there were no restrictions on his ability to use it, as there had been when it was in his ERISA Plan.

Even had the transfer gone directly from the ERISA Plan to the IRA, there still would have been a change in status because the assets, management and terms of the IRA were different from those of the ERISA Plan.

In this case, Charles Carter's IRA was always subject to his own control and use. Not more than $15,000.00 in deposits made in any one year would have been exempt from creditor attachment. There is no evidence in this case of what amount Debtor contributed to his IRA annually. However, when he withdrew $190,000.00, and then redeposited it into another IRA account, the status of the money changed. He had total control of the funds when he removed them from the IRA and could have done with them as he chose. When he received money back, he did not have to deposit it into an IRA. He merely would have incurred some penalty had he not replaced the funds within 60 days. His deposit was voluntary and no law required the deposit. In addition, he replaced $190,000.00, not $15,000.00. At best, therefore, prepetition, the Debtor would have been entitled to exempt from creditor attachment not more than $15,000.00 for the redeposit he made in 1992. Because we conclude that Debtor's IRA proceeds were not fully exempt from creditors' claims prepetition, we must examine the questions of discharge and dischargeability.

■ The evidence established that Debtor chose to spend all of the funds in the IRA for his own use rather than paying the judgment that was entered against him. He has never satisfactorily explained before this court, although given many opportunities, the use of all of the IRA proceeds. Therefore, his discharge will be denied under 11 U.S.C. § 727(a)(5).

■ Under § 727(a)(5), a debtor will be denied a discharge if he does not satisfactorily explain any loss or deficiency in his assets. A debtor must provide some credible explanation that will convince the court

that he has not hidden or improperly shielded assets. Explanations of losses that are generalized, vague, indefinite and uncorroborated by documentation are unsatisfactory.

The statute provides: "The court shall grant the debtor a discharge, unless the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).

■■■ In the context of nondischargeability, the Court is mindful that the objections to discharge found in § 727 are to be construed strictly against the creditor and liberally in favor of the debtor. *In re Lawrence,* 227 B.R. 907, 915 (Bankr. S.D.Fla.1998) (citing *Matter of Juzwiak,* 89 F.3d 424, 427 (7th Cir.1996)). However, a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor. *Id.*

■■■ A debtor may not receive a discharge if he fails to satisfactorily explain a loss of assets. 11 U.S.C. § 727(a)(5). The global purpose of § 727(a)(5) is clear. A debtor must come into court and make full disclosure of his finances. He may not place the burden of "discovering" assets upon others. *Id.* at 916 (citing *Juzwiak,* 89 F.3d at 429). Section 727 makes "complete financial disclosure a 'condition precedent' to the privilege of discharge." *Id.*

■■■ The plaintiff has the initial burden of proof, on an objection to discharge, in establishing that the debtor has failed to explain a loss of assets. *See* Fed. R.Bank.P. 4005. The plaintiff must introduce more than merely an allegation that the debtor has failed to explain losses. The plaintiff must produce some evidence of the asset losses. *In re Ishkhanian,* 210 B.R. 944, 953 (Bankr.E.D.Pa.1997) (citing *In re Somerville,* 73 B.R. 826 (Bankr. E.D.Pa.1987)). The plaintiff must meet the "preponderance of the evidence" standard rather than the more demanding "clear and convincing" standard. *In re*

*Ishkhanian,* 210 B.R. at 949 (citing *Grogan v. Garner,* 498 U.S. 279, 285–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). There is no requirement that a debtor act fraudulently or intentionally in order for a plaintiff to sustain objections to discharge based upon § 727(a)(5). *In re Ishkhanian,* 210 B.R. at 953 (citing *In re Blanchard,* 201 B.R. 108, 120 (Bankr.E.D.Pa. 1996)). However, once the plaintiff has met the initial burden by introducing sufficient evidence of an unexplained absence of assets, the burden shifts to the debtor to come forward with a satisfactory explanation. *In re Levy,* 221 B.R. 559, 561 (Bankr.S.D.Fla.1998) (citing *First Federated Life Ins. Co. v. Martin (In re Martin),* 698 F.2d 883, 887 (7th Cir.1983)). The debtor has the ultimate burden of persuasion. *In re Poland,* 222 B.R. 374, 379 (Bankr.M.D.Fla.1998) (citing *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir.1984)).

■■■ "The question of satisfactoriness turns on the nature of the debtor's business, financial affairs, and lifestyle." *Chusid v. First Union National Bank,* 1998 WL 42292, *4 (E.D.Pa.1998) (citing *In re Gallini,* 96 B.R. 491, 493 (Bankr. M.D.Pa.1989)). The debtor need only provide some credible explanation of the loss or deficiency of the assets to satisfy the requisite burden under § 727(a)(5). *In re Ishkhanian,* 210 B.R. at 953 (citing *In re Somerville,* 73 B.R. at 826). Some type of believable, direct evidence will be required to defeat an objection based on failure to explain a loss of assets. *In re Levy,* 221 B.R. at 561 (citing *Hawley v. Cement Industries, Inc. (In re Hawley),* 51 F.3d 246, 249 (11th Cir.1995)). For a debtor's explanation of the loss of his assets to be satisfactory, the explanation must "convince the judge", *In re Poland,* 222 B.R. at 381 (citing *Chalik,* 748 F.2d at 619), that the debtor has not hidden or improperly shielded assets. *In re Cromer,* 214 B.R. 86, 95 (Bankr.E.D.N.Y.1997) (citing *In re Bodenstein,* 168 B.R. 23, 33 (Bankr. E.D.N.Y.1994)). Explanations of losses

that are generalized, vague, indefinite and uncorroborated by documentation are unsatisfactory. *Chusid,* 1998 WL 42292 at *4 (citing *In re Cook,* 146 B.R. 934, 941 (Bankr.E.D.Pa.1992)). The question of whether a debtor satisfactorily explains a loss of assets is a question of fact. *In re Levy,* 221 B.R. at 561 (citing *In re Chalik,* 748 F.2d at 619). A debtor's repeated failure to answer questions with anything but evasions and half-truths constitutes a willful and bad faith failure. *See In re Lawrence,* 227 B.R. at 916 (citing *National Hockey League, et al. v. Metropolitan Hockey Club, Inc., et al.,* 427 U.S. 639, 642–43, 96 S.Ct. 2778, 49 L.Ed.2d 747, *reh. denied,* 429 U.S. 874, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976)). The debtor's explanation must convince the court of the debtor's good faith and businesslike conduct. *In re Wilbur,* 211 B.R. 98, 101 (Bankr. M.D.Fla.1997) (citing *In re Simmons,* 113 B.R. 741, 745 (Bankr.M.D.Fla.1990)). The debtor's explanation should not arouse suspicion regarding the loss of assets. *Id.* General assertions that money was spent on living expenses or lost through gambling, without documentation, are unacceptable. *Id.* (citing *In re Goblick,* 93 B.R. 771, 775 (Bankr.M.D.Fla.1988)).

In the present case, Debtor Charles Carter is well educated and articulate. He understood what it meant to have a judgment against him and his obligation to pay it. He had about $190,000.00 in his IRA in May 1995 when Carter Engineering received a judgment against him. From June 1995 to September 1996, Debtor withdrew all but about $55,000 from his IRA to pay for alleged tax liabilities, legal fees [7] and personal uses such as living expenses. By January 1997, essentially nothing was left in Debtor's IRA and he still had not paid Carter Engineering the judgment that it had received in May of 1995. When questioned about the money, Debtor was unable to explain large portions of his withdrawals. As to some transactions, he was only able to give vague generalities, and not specific details. As to others, he gave no explanation at all. One of his withdrawals from his IRA totaled $16,000 and occurred twenty days or so before Debtor filed bankruptcy. He testified that he could not recall why he made that withdrawal or what he did with the proceeds.

Debtor also testified that he never intended to repay the money to Carter Engineering because he believed that the debt C3 owed him and the debt he owed Carter Engineering would offset each other. He also testified that C3 and Carter Engineering were going to be treated as one business even though each company had separate books and records and no documentation exists to establish such treatment. This testimony is unconvincing and uncorroborated by documentation. C3 and Carter Engineering were never operated as one enterprise. Moreover, the testimony is suspect because there was no evidence of a corporate purpose for Carter Engineering to loan Debtor $140,-000 and Debtor testified that he always knew that these funds were paid to him as an offset for the money he put into the C3 escrow for C3's purchase of Carter Engineering's stock.

Based on the testimony of Debtor's financial affairs, lifestyle and business dealings, there was no credible explanation for the diminution in Debtor's IRA account which created a deficiency in his assets otherwise available to pay his liabilities. This court is not convinced that Debtor has not hidden or improperly shielded assets in order to avoid paying Carter Engineering its judgment. For the above reasons, Debtor will be denied a discharge under § 727(a)(5).

■ The complaint also alleges violations of § 727(a)(2)(A). The court shall grant a debtor a discharge, unless "the

---

**7.** Debtor has never explained how he accrued and paid approximately $98,000 in legal fees in that time.

debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A). The creditor must prove these elements by a preponderance of the evidence. *In re Halperin*, 215 B.R. 321, 328 (Bankr.E.D.N.Y.1997) (citing *In re Kablaoui*, 196 B.R. 705, 708 (Bankr. S.D.N.Y.1996)).

▪▪▪▪ Bankruptcy Code § 727(a)(2)(A) requires the plaintiff to show that: 1) a transfer occurred; 2) that the property transferred was property of the debtor; 3) that the transfer was within one year of the petition; and 4) that at the time of the transfer, the debtor possessed the requisite intent to hinder, delay or defraud a creditor. *In re Wilbur*, 211 B.R. 98, 103 (Bankr.M.D.Fla.1997) (citing *In re More*, 138 B.R. 102, 104 (Bankr.M.D.Fla. 1992)). To prevail under § 727(a)(2)(A), the plaintiff must prove actual intent to hinder, delay, or defraud creditors rather than constructive intent. *Id.* (citing *In re Kindorf*, 105 B.R. 685, 689 (Bankr. M.D.Fla.1989)). Actual intent may be inferred from the totality of the circumstances. Indicative of a fraudulent intent are: the lack or adequacy of consideration; the family, friendship or close association between the parties; the retention of possession, benefit or use of the property in question; the financial condition of the party sought to be charged both before and after the transaction; the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and the general chronology of the events and transactions under inquiry.

*Id.* at 103–04 (citing *In re Wade*, 189 B.R. 522, 525 (Bankr.M.D.Fla.1995)).

▪▪▪▪ From June 1995 to September 1996,[8] Debtor withdrew all but $55,000 from his IRA. In the present case, Debtor made withdrawals from his IRA between June 1995 and June 1997 and filed for bankruptcy on June 2, 1997. These withdrawals were between one and two years before he filed for bankruptcy. Debtor's own testimony establishes that Debtor had an actual intent to hinder or delay creditors in making the transfers. He structured the transactions in a way that creditors could not find assets to attach and admitted that he took steps to avoid paying creditors. Actual intent, not just constructive intent, is required for a denial of a discharge under § 727(a)(2)(A). That element was met by Debtor's testimony as to his intent. Therefore, § 727(a)(2)(A) also applies to bar discharge.

Because debtor's discharge is denied under § 727(a)(5) and § 727(a)(2)(A), it is not necessary to address the dischargeability issue under § 523(a)(2)(A) and (a)(4). We note, however, that were we compelled to rule upon those matters, we would find the elements of § 523(a)(4) were not established as there was no evidence that Debtor acted in a fiduciary capacity or committed fraud, embezzlement or larceny as to Carter Engineering. Further, the elements of § 523(a)(2)(A) were not met because Debtor made no false statements to induce Carter Engineering to pay him $140,000. The facts established that the other shareholders in C3, who all knew of Debtor's funding of the C3 escrow and who controlled Carter Engineering, misappropriated Carter Engineering's funds and paid them over to Debtor so that he could replenish his IRA. Debtor, however, did not induce this conduct through false statements. The testimony established that Debtor was an officer and director of

---

**8.** For transfers within the one-year period prepetition, *see* the underlined entries on Exhibit P–16. Among other transfers, Debtor withdrew $16,000 from his IRA about 20 days prepetition and could not explain why or what use he made of the proceeds.

Carter Engineering at the time of the $140,000 wire transfer but did not control its funds. Further, his co-shareholders understood that Debtor wanted to be repaid the amount he put into the C3 escrow in sufficient time that he would not incur an early withdrawal penalty and they acted accordingly by taking money from a ready source—Carter Engineering.