**In re Marjorie Margolies MEZVINSKY, Debtor.**

**David G. Sonders, Plaintiff,**

**v.**

**Marjorie Margolies Mezvinsky, Defendant.**

**First Union National Bank, Plaintiff,**

**v.**

**Marjorie Margolies Mezvinsky, Defendant.**

**Bankruptcy No. 00–11767DWS.**

**Adversary Nos. 00–0462, 00–0463.**

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 1, 2001.

---

Zachary L. Grayson, Esquire, Jennifer L. Myers, Esquire, Philadelphia, PA, for Defendant/Debtor.

Steven J. Adams, Esquire, Reading, PA, for Plaintiff First Union National Bank.

Leonard P. Goldberger, Esquire, White & Williams, LLP, Philadelphia, PA, for Plaintiff David G. Sonders.

Marvin Krasny, Esquire, Philadelphia, PA, Chapter 7 Trustee.

Dave P. Adams, Esquire, Philadelphia, PA, United States Trustee.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court are the Motions of (1) David G. Sonders ("Sonders") for Partial Summary Judgment ("Sonders Motion") and (2) First Union National Bank ("First Union") for Summary Judgment (the "First Union Motion") on their respective Complaints objecting to discharge of the Debtor pursuant to 11 U.S.C. § 727(a)(5).[1] In support of his Motion, Sonders presents his affidavit to support documents obtained from the official records filed with the United States Bankruptcy Court and the Office of Public Records of the United States Senate.[2] In response to the Sonders Motion, Debtor presented her affidavit[3] and certain

1. The Sonders Motion seeks to deny the Debtor a discharge on the grounds of 11 U.S.C. §§ 727(a)(2),(a)(3), (a)(4) as well as (a)(5). At argument on the First Union Motion, Debtor's counsel acknowledged that an adverse decision on the identical (a)(5) grounds pressed by First Union and Sonders would render a decision on the other issues raised by the Sonders Motion unnecessary. I concur. Accordingly, I do not reach those other grounds.

2. Those documents are as follows: Exhibit A Schedule B, Personal Property; Exhibit B Schedule C, Property Claimed as Exempt; Exhibit D Statement of Financial Affairs; and Exhibit E United States Senate Public Financial Disclosure Report for New Employee and Candidate Reports. *In re Leonard,* 151 B.R. 639 (Bankr.N.D.N.Y.1992) (same), some of

the Debtor's bankruptcy schedules were amended after Sonders filed his motion. As noted herein, to the extent I rely upon documents filed with this Court, I rely upon the amended versions. "Factual assertions in pleadings are judicial admissions against the party that made them", *Larson v. Groos Bank,* 204 B.R. 500, 502 (W.D.Tex.1996) (statements in schedules). *See also In re Musgrove,* 187 B.R. 808 (Bankr.N.D.Ga.1995) (same);

3. Rather than submit an affidavit of specific sworn facts, Debtor presents a general affidavit in which she swears to the truth of the facts set forth in the Memorandum in Opposition to the Sonders' Motion ("Mem. Opp. Sonders Mem."). Since much of the Memorandum is argument and many of the facts

documents.[4] First Union's record consisted of its Complaint and the Debtor's Answer, the transcripts of Debtor's testimony at (i) her first meeting of creditors conducted on April 24, 2000 ("341 Transcript"); (ii) her Rule 2004 examination conducted on March 22, 2000 and June 6, 2000 ("Rule 2004 Testimony") and (iii) her deposition testimony given on February 6, 2001 and April 10, 2001 and exhibits MMM–1 through MMM–28 attached thereto ("Debtor's Dep."). First Union also incorporated by reference portions of the Sonders Motion. Memorandum in Support of First Union Motion ("First Union Mem.") at 15. Debtor provided no additional evidence in opposition to the First Union Motion but rather also incorporates portions of her response to the Sonders Motion, including her Affidavit therein.[5]

For the reasons that follow below, the Court finds that Sonders and First Union (collectively the "Movants") have met their burden for entry of judgment. I will therefore sustain their objection to, and deny entry of, the Debtor's Chapter 7 discharge pursuant to § 727(a)(5).

**BACKGROUND**

The Debtor is a former member of the United States House of Representatives (One Hundred Third Congress January 3, 1993–January 3, 1995). A graduate of the University of Pennsylvania and former CBS New Foundation fellow (Columbia University), she worked as a television journalist for twenty-five years, has written three books, and has offered testimony before United States House of Representative and Senate Subcommittees on family issues. After her Congressional term concluded, she was named the head of the American delegation to the United Nation Fourth World Congress on Women in Beijing and later became the President of the Women's Campaign Fund. Debtor's Dep. at 73–75 and Exhibit MMM–5. She filed this voluntary petition for bankruptcy (the "Petition") on February 10, 2000 (the "Petition Date").[6]

Sonders and First Union are creditors of the Debtor and filed their adversary proceedings on April 4 and June 23, 2001, respectively, alleging that the Debtor has failed to explain satisfactorily the disposition of significant assets in violation of § 727(a)(5) of the Bankruptcy Code. The following facts are undisputed:

I. In May 1996,[7] the Debtor and her husband purchased a homeowners's insur-

---

not within her first hand knowledge, it is hard to know what she is swearing to. However, for the purposes of this Motion, I will accept her attestation of facts that are capable of being known to her.

4. The documents submitted are the following: Exhibit A Indictment in United States of America v. Edward M. Mezvinsky; Exhibit B Appraisal Reports prepared by Barry S. Slosberg Inc. ("Slosberg Appraisals") and Exhibit C Young Adjustment Co. inventory ("Young Inventory").

5. Since no similar attestation or any other evidence was submitted in opposition to the First Union Motion, Debtor relies entirely on the Sonders Motion record to support her response. Since both First Union and Debtor

have utilized this "incorporation" approach, I shall deem them to have waived any objection to this evidentiary shortcut.

6. I shall take judicial notice of the docket entries in this case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino,* 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995).

7. The Complaint and Answer pinpoint the date of this representation to the insurance company as occurring in May 1996 while the deposition testimony refers to May 1999.

ance policy from Nationwide Insurance Company ("Nationwide") obtaining coverage for personal property in which they claimed an interest valued at $810,535. First Union Complaint and Answer (" FU Compl. and Ans.") ¶ 14; Rule 2004 Exam at 287. In January 1995, Debtor's husband represented to the Pennsylvania Housing Finance Agency that he and the Debtor owned furniture and other personal property having a value of $725,000. FU Compl. and Ans. ¶ 11. At the first meeting of creditors held on April 24, 2000, Debtor did not recall any significant dispositions of personal property by herself or her husband since 1989. *Id.* ¶ 15. Yet in her Amended Schedule B, the Debtor claims her one-half interest in the personal property in which she and her husband claim an interest as of the Petition Date plus her interest in wearing apparel and clothing to be valued at approximately $19,217.[8] Ex. MMM-3 to Debtor's Dep.; FU Compl. and Ans. ¶ 9.

II. The Debtor sold 15,595 shares of Charming Shoppes stock in February 1999 and another 1847 shares in January 2000, for which she received a total of $63,771 (the "Charming Shoppes Proceeds"). Amended Statement of Financial Affairs ¶ 10.

III. On January 7, 2000, the Debtor sold ten shares of General Electric stock and seventy-one shares of PNC Bank Stock for $1,382.61 and $2,772.98, respectively (collectively the "Misc. Stock Proceeds"). Ex. MMM-24 to First Union Mot. The Misc. Stock Proceeds are not listed in the Debtor's Amended Bankruptcy Schedules nor is the sale of or disposition of the Misc. Stock Proceeds disclosed in her Amended Statement of Financial Affairs.

IV. Between 1997 and 1999, the Debtor and her husband borrowed money from various friends and acquaintances in various amounts, totaling $1,477,500 (the "Personal Loan Assets").[9] The Debtor concedes that these loans were made to her and her husband jointly.[10] The Personal Loan Assets are not listed in the Debtor's Amended Bankruptcy Schedules nor are any transfers of the Personal Loan Assets

---

Rule 2004 Exam at 287. Giving the Debtor the benefit of the doubt, I am assuming for the purpose of this adjudication that the former is correct as it would be harder to justify a major deterioration in the value of assets over the period of one year or the use by the Debtor of a 1992 appraisal some seven years later.

8. For purposes of comparison with the $810,535 insurance estimate, the Debtor's scheduled values must be doubled as to property owned jointly by her and her husband. *See* discussion *infra* § II.A.

9. The individual loans consist of the following:

(1) $27,500 from Connie Williams (the "Williams Loan") within two years of filing the Petition. Rule 2004 Exam at 145–47;
(2) $100,000 from Janet Boyle (the "Boyle Loan") sometime in 1998 or 1999. Rule 2004 Exam at 148–49;

(3) $1,100,000 from Richard Snyder (the "Snyder Loan") in 1998 or 1999. Rule 2004 Exam at 208–09;
(4) $150,000 from Gerald Segal (the "Segal Loan") over several months in 1999. Rule 2004 Exam at 153–54, 198–99; and
(5) $100,000 from Donald Spero (the "Spero Loan") in 1997. Rule 2004 Exam at 152–53.

10. The Debtor expressly testified that both she and her husband signed for the Williams, Segal and Boyle Loans. Rule 2004 Exam at 196–99, 203–04. Her testimony regarding the Spero Loan does not make it entirely clear whether it was made either to her directly or to both her and her husband. *Id.* at 152–53. The Debtor testified as to her status as co-debtor on the Segal and Snyder Loans. *Id.* at 206–08. Finally, all five lenders are listed as unsecured creditors on the Debtor's Schedule F in the same amounts as the loans discussed above, and the Debtor has not contested her status as co-debtor on these loans.

disclosed in her Amended Statement of Financial Affairs.

V. On August 15, 1999 and February 25, 2000, the Debtor signed and filed personal financial statements, prepared by her husband, with the United States Senate in connection with her candidacy for the Senate (the "Senate Financial Disclosure"). The Senate Financial Disclosure indicates an ownership interest in various securities and note receivables valued at a minimum of $1.3 million. Rule 2004 Exam at 175; Ex. E to Sonders Motion.[11]

VI. On or about September 24, and October 24, 1999, the Debtor wrote two checks in the amounts of $7,500 and $5,000, respectively, from a Prime Bank account in the name of the Debtor and her husband, to her housekeeper Roberta McClean ("the McClean Payments"). Ex. "J" to Sonders Mot. The McClean Payments are not disclosed in the Debtor's Amended Statement of Financial Affairs.

VII. In January 2000, the Debtor sold several personal items to Nancy Chasen (the "Chasen Transaction") for $5,000 (the "Chasen Proceeds"). Amended Statement of Financial Affairs. ¶ 10. The Chasen Proceeds are not listed in the Debtor's Amended Schedules, but her discovery responses indicate that Ms. Chasen paid the proceeds directly to Northfield Mount Herman School, the school attended by the Debtor's son, Andrew. Debtor's Obj. and Resp. to Sonders' First Set of Interrogs. ¶ 27, Ex. "G" to Sonders Mot.

## DISCUSSION

Summary judgment is warranted only where "the pleadings, depositions, answers to interrogatories and admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).[12] Thus, when deciding a summary judgment motion, the court's task is not to resolve questions of fact, but to determine whether there is in fact any genuine issue of fact to be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In doing so, the court should view all facts in the light most favorable to the opposing party, *Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982), including any factual inferences, and refrain from resolving a genuine issue of credibility, *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 268 (3d Cir.2001) (citation omitted); *Boyle v. Allegheny County, Pa.*, 139 F.3d 386, 393 (3d Cir.1998).

It is the moving party's burden to demonstrate the absence of genuine issues of material fact. *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 790 (3d Cir.1978). Once the moving party has shouldered this burden, however, "the adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A party opposing summary judgment cannot hold back his evidence until trial, *McIntyre v. Delaware Division of Youth Rehabilitation Services*, 795 F.Supp. 668, 673, (D.Del.1992) (citations

11. Exhibit E to the Sonders Motion is the completed form "United States Senate Public Financial Disclosure Report for New Employee and Candidate Reports." The form requires assets to be disclosed within a range of values. The $1.3 million aggregate value represents the minimum value for each asset disclosed therein by the Debtor.

12. Federal Rule of Civil Procedure 56 is incorporated by Federal Rule of Bankruptcy Procedure 7056.

omitted), nor may he demand trial on the speculative possibility that a material issue of fact may emerge at that time, *Frito-Lay of Puerto Rico, Inc. v. Canas*, 92 F.R.D. 384, 391 (D.Puerto Rico 1981) (rejecting assertion that discoverable evidence might arise from cross-examination at trial of the moving party's affiant). Statements in legal memoranda and oral argument are not evidence and cannot create an issue of fact. *Id.*

■ Section 727(a)(5) of the Bankruptcy Code states that a court will grant the debtor a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). Movants, as plaintiffs, bear the burden of proof. Fed. R. Bankr.P. 4005 ("At a trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection"). Further, under § 727(a)(5), the plaintiff also bears the initial burden of production: *i.e.*, to establish, by a preponderance of the evidence, that the debtor had a cognizable interest in a specific identifiable property at a time not too far removed from the bankruptcy which she now no longer possesses.[13] *Pyramid Technology Corp. v. Cook (In re Cook)*, 146 B.R. 934, 940–41 (Bankr.E.D.Pa.1992); *McGowan v. Beau-soleil (In re Beausoleil)*, 142 B.R. 31, 37 (Bankr.D.R.I.1992); *M.R. Toupin, Inc. v. Turpin (In re Turpin)*, 142 B.R. 491, 496 (Bankr.M.D.Fla.1992). It is insufficient to merely allege that the debtor has failed to explain losses, the plaintiff must produce some evidence of an identifiable asset loss. *Carter Engineering Co. v. Carter (In re Carter)*, 236 B.R. 173, 180 (Bankr.E.D.Pa. 1999); *La Brioche, Inc. v. Ishkhanian (In re Ishkhanian)*, 210 B.R. 944, 953 (Bankr. E.D.Pa.1997). Once the plaintiff has met this burden and thus made out a *prima facie* case, the burden of production (*i.e.*, coming forward with evidence) shifts to the debtor to explain satisfactorily the losses or deficiencies. *Cook*, 146 B.R. at 941. The plaintiff's ultimate burden of proof does not obviate the debtor's obligation to come forward with a satisfactory explanation. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984).

■ What constitutes a "satisfactory" explanation is a matter of discretion for the court, *Buzzelli*, 246 B.R. at 117, but one of the better enunciations of this amorphous concept can be found in *Slocum v. Wheeler (In re Wheeler)*, 38 B.R. 842 (Bankr.E.D.Tenn.1984). There, the court said:

> The word "satisfactorily," . . . may mean reasonable, or it may mean that the court, after having heard the excuse, the

---

13. With respect to the time period for which a debtor is required to account for her financial condition under § 727(a)(5), one court, after reviewing Code and Act cases, that found long-term inquiry to be relevant stated:

> Thus, it is clear that the temporal depth of the inquiry permissible under §§ 727(a)(3) and 727(a)(5) cannot be set according to a rigid rule; it must be determined only on a case-by-case basis, bearing in mind that, under the statute, "... the interests protected are those of creditors and ... the [debtor] is required to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what

he did with his estate." *Koufman v. Sheinwald*, 83 F.2d 977, 980 (1st Cir.1936); *In re Kinney*, 33 B.R. 594, 596 (Bankr.N.D.Ohio 1983).

*In re Losinski*, 80 B.R. 464, 473 (Bankr. D.Minn.1987) (inquiring six years before petition date). *See also PNC Bank v. Buzzelli (In re Buzzelli)*, 246 B.R. 75, 117 (Bankr.W.D.Pa. 2000) (*quoting Losinski supra*) (while in the ordinary consumer case, it is probably reasonable to limit the inquiry to two years before the commencement of the filing, there is no "hard and fast rule" that dictates the time period prior to a bankruptcy filing which is relevant to an inquiry under § 727(a)(5)).

explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the [debtors] say with reference to the disappearance or the shortage.... He no longer wonders. He is contented. *Id.* at 846 (*quoting In re Shapiro & Ornish,* 37 F.2d 403 (N.D.Tex.1929)). Similarly, in this circuit, it has been held that the explanation must "convince the judge" that the explanation is worthy of belief. *Chusid v. First Union National Bank (In re Chusid),* 1998 WL 42292, at *4 (E.D.Pa. Jan.21, 1998); *Buzzelli,* 246 B.R. at 117; *Carter,* 236 B.R. at 180 (both *quoting Chalik,* 748 F.2d at 619).

■ It is important to note that, for the purposes of a § 727(a)(5) inquiry, the court is not concerned with whether the disposition of the assets was proper under the Bankruptcy Code, but rather only whether the explanation satisfactorily describes what happened to the assets. *Buzzelli,* 246 B.R. at 117. It is not surprising, therefore, that explanations of a generalized, vague, indefinite nature such as assets being spent on "living expenses," unsupported by documentation, are unsatisfactory. *Id.; Carter* 236 B.R. at 180–81. Equally unavailing is mere identification of a person with knowledge, such as an accountant or other individual who handled the financial affairs of the debtor. *Chusid,* 1998 WL 42292 at *5; *Cook,* 146 B.R. at 942.

■ While the objections to discharge found in § 727 are to be strictly construed against the creditor and liberally in favor of the debtor, *Rosen v. Bezner,* 996 F.2d 1527, 1533 (3d Cir.1993), a discharge in bankruptcy is a privilege—not a right—which must be earned. Upon filing for bankruptcy, it is the debtor's obligation to be forthright in providing financial information. "No one is obligated to recreate the Debtor's financial affairs; that task

is his alone." *Goldberg ex rel. Lawrence v. Lawrence (In re Lawrence),* 227 B.R. 907, 915 (Bankr.S.D.Fla.1998) (*citing* legislative history of 11 U.S.C. § 521 (debtor's duties)). The Bankruptcy Code makes complete financial disclosure a "condition precedent" to discharge. *Id.* (*citing Broad Nat'l Bank v. Kadison,* 26 B.R. 1015, 1018 (D.N.J.1983)). *See also Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir.1992) (discussing § 727(a)(3)). To that end, § 727(a)(5) works in conjunction with the other subsections of § 727 to reflect this legislative policy decision. *Buzzelli,* 246 B.R. at 116. For example, § 727(a)(3) ensures that the debtor maintain and supply records which are adequate to provide the creditors with sufficient information to ascertain the debtor's financial condition and track his past and present dealings. *Lawrence,* 227 B.R. at 916. Other subsections ensure that a debtor does not provide false oath or withhold information. *Id.* (*citing* 11 U.S.C. §§ 727(a)(4)(A) and (a)(4)(D)). In short, the global purpose of § 727 is to relieve creditors from the burden of "discovering" assets and to place it where it rightfully belongs, upon the debtor. *Id.*

■ So important is this concept of disclosure, that § 727(a)(5) includes no subjective element of proving wrongful scienter such as an intent to defraud or hinder creditors. *See Cook,* 146 B.R. at 943 (comparing §§ 727(a)(3) and (a)(5) to §§ 727(a)(2) and (a)(4)). Further, unlike § 727(a)(3), pertaining to a debtor's duty to maintain records, which *can* be satisfied by a justification for the debtor's failure to do so, "the plain language of § 727(a)(5) makes clear that a debtor cannot prevail thereunder by similarly offering a justification for his or her failure to satisfactorily explain the loss or disappearance of assets." *Buzzelli,* 246 B.R. at 118. Thus, a debtor facing an objection to discharge under § 727(a)(5) may very well have to

gather or produce documents and records which she might otherwise not ordinarily keep and in fact may be justified for failing to keep under § 727(a)(3). *Id.* She may well have to hire professionals to locate her assets if she is unable to do so herself. *See Cook*, 146 B.R. at 934 (debtor had obligation to hire an accountant to explain the disappearance of assets not readily apparent from records).

Applying these standards, I now examine the alleged loss and/or deficiency of assets upon which the Movants base their motions.

## I. *Diminution of Personal Property*

The Movants rely upon the fact that the Debtor represented to her insurance company having an interest in personal property worth $810,535 in May 1996 and not recalling any significant dispositions of her property since 1989, while attributing approximately $19,217 of value to the personal property in which she claims an interest in her Amended Schedule B. First Union Mem. at 8–9. There is *no genuine issue of fact that the Debtor made these representations as they are* admitted in her Answer to the Complaint. A plaintiff makes out a *prima facie* case where it shows that the debtor has listed

assets in her bankruptcy schedules less than she has previously presented herself to be worth. *Buzzelli*, 246 B.R. at 116.[14] The burden now shifts to the Debtor to explain why property valued at over $810,000 four years before the Petition Date is now worth less than five percent of that amount. *Id.*

Before turning to the Debtor's explanation, it is clear that the comparisons urged by Movants are not completely accurate nor for that matter is the Debtor's explanation of the support for her latest estimate of value. The $810,535 valuation purports to be the value in 1996 of all tangible personal property owned by *Debtor and her husband.* The $19,217 value is derived from the Slosberg Appraisals which provide the orderly liquidation value of the *Debtor's property* as of February and April of 2000. Ex. MMM–3 to Debtor's Dep. (Amend.Sched.B).[15] To arrive at the Debtor's interest in the household goods and artwork and collectibles which represent the items appraised by Slosberg, the Schedule B attachment reflects a calculation which deducts from the total appraised value of such property approximately $15,585 of assets Debtor asserts to be holding for third parties[16] and divides

---

**14.** Notably Debtor does not contend that this alleged unexplained loss is too far removed from the filing of the bankruptcy case to be probative. If, however, the representation occurred in 1996 (*see* n. 2 *supra*), the statement to the insurance company may have occurred almost four years before the petition was filed, unlike the other representations considered here which were made within one or two years of the commencement of this case. However, the age of the representation is mitigated by the extent of the loss and the existence of other unexplained losses, and thus will be considered even if made four years ago.

**15.** There are actually two appraisals as exhibits to Amended Schedule B. The first lists property appraised at a total liquidation value

of $34,260 as of February 5, 2000. The second appraisal is much shorter and lists personal property appraised at a total liquidation value of approximately $5,050 as of April 12, 2000. The second appraisal consisting of art and antiques is labeled an "addendum." In an attachment to Amended Schedule B, Debtor refers to the later addendum as adding value of $5,359 (versus $5,050) and includes two additional addenda to the Slosberg Appraisals which add another $8,500 to the property valued. The additional addenda are not attached. No explanation is provided for the multiple addenda.

**16.** Again for the purpose of § 727(a)(5), it is the existence of an explanation, not the propriety of the transfer, that is at issue. Wheth-

the remainder by two to conclude that *Debtor's interest* in the joint property is $16,217. By adding the $3,000 scheduled clothing and jewelry, Debtor's interest in tangible personal property is fixed at $19,217. However, a fair comparison with the $810,535 would be approximately a value of $35,434 ($16,217 × 2 + $3,000).

█ The Debtor attributes the disparity between the property value provided to Nationwide and the value recorded in her schedules to her reliance on two different appraisals secured at different times and for different purposes.[17] Rule 2004 Exam at 287–88; Debtor's Dep. at 176. She claims that the representation to Nationwide in 1996 is based upon the Young Inventory done subsequent to a 1992 fire in her residence and supplemented by the opinion of her husband. The Young Inventory is a 93–page, hand-written document reflecting a meticulously detailed room by room listing of household items on a form dated February 2 through 6, 1992.[18] Ex. "C" to Mem. Opp. Sonders Mot.[19] While it

er these assets were transferred after 1996 so as to have been part of the $810,535 was not stated and indeed Debtor does not attribute the third party items as relevant to this inquiry.

17. The only other explanation provided by the Debtor is that some items of furniture were not as valuable as she originally thought. Debtor's Dep. at 117–21, 176. However these statements alone are too vague and generalized to provide evidence to rebut the demonstrated erosion of value of her personal property. Since the Debtor provided no specific details as to the basis of her misperception nor quantified the impact on the valuation of the furniture, the testimony is insufficient to create a factual issue for trial.

18. This is consistent with the Debtor's testimony that the fire occurred in January 1992. Debtor's Dep. at 104, 115.

19. I note that exhibits and other papers supporting and opposing summary judgment "must be of such a quality as to be admissible at trial." *Kohr v. Johns–Manville Corp.*, 534 F.Supp. 256, 257–58 (E.D.Pa.1982). Documents attached to a summary judgment brief, absent affidavit support attesting to their validity, are not evidence. *Berk v. Ascott Inv. Corp.*, 759 F.Supp. 245, 249, (E.D.Pa.1991) (affidavits attesting to authenticity of documents is necessary in order to present ˌthe documentation on a motion for summary judgment). While the Slosberg Appraisals are sworn and notarized and thus self-authenticating, Fed.R.Evid. 902(8), the Young Inventory is not authenticated by affidavit or deposition testimony. Thus, the Young Appraisal is inadmissable. However, it is a well accept-

ed principle that " [a]s is true with other material introduced on a summary judgment motion, uncertified or otherwise inadmissible documents may be considered by the court if not challenged." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2722, at 384 (1998). *Accord Johnson v. United States Postal Service*, 64 F.3d 233, 237 (6th Cir.1995) (ruling that the "failure to object to evidentiary material submitted in support of a summary judgment motion constitutes a waiver of those objections."); *H. Sand & Co., Inc. v. Airtemp Corporation*, 934 F.2d 450, 454–55 (2d Cir.1991) (Rule 56 does not require parties to authenticate documents "where appellee did not challenge the authenticity of the documents in the district court."); *Dautremont v. Broadlawns Hospital*, 827 F.2d 291, 294–95 (8th Cir.1987) (affirming summary judgment where appellant failed to object in district court to its consideration of documents not in compliance with Rule 56 and failed to demonstrate that district court's consideration of documents constituted reversible error); *Giovacchini v. Perrine*, 1995 WL 80102, at *3 n. 1 (E.D.Pa. Feb.27, 1995) (*citing* Federal Practice and Procedure § 2722) (holding thatˈ unauthenticated medical reports would be considered in ruling on motion for summary judgment since no objection was raised thereto). Another treatise offers the following insight:

> Rule 56(e) does not require parties to authenticate documents where the appellant failed to challenge the authenticity of the documents in district court. An evidentiary objection, not raised in district court, is waived on appeal. This rule is equally applicable to a summary judgment motion as

evidences under the preprinted column labeled "value" a dollar amount represented as "ACV" or "FMV or ACV" or "EST ACV" for each item listed, the document is totally devoid of explanation as to the significance of these entries nor does it in any way cumulate or present the data so any conclusions can be drawn therefrom. Instead it merely proffers 93 pages of raw data without commentary. Indeed without going through the list, item by item with a calculator, I cannot even ascertain whether this appraisal supports the representation to Nationwide that the property was valued at $810,535.

The Debtor when examined about the Young Inventory had little recollection or understanding of its significance. Other than stating that it was created after a fire in the marital home, she never elucidates what its purpose was. She testifies that after the fire numerous items of furniture, rugs, clothing, and other possessions were replaced or repaired, some at great expense. Debtor's Dep. at 122, 126–27, 132, 139. However, the significance of that statement as relates to the Young Inventory was never clarified. The Slosberg Appraisal makes no mention of, much less any attempt to reconcile, itself with the Young Inventory, and the Debtor's testimony is simply too vague to bridge the gap. If the Debtor is claiming that the Young Inventory and Slosberg Appraisals explain the loss in value in her personal property, "the burden [is] on the Debtor to prove what [s]he alone claim[s] was obvi-

ous from [her] records." *Cook,* 146 B.R. at 942–43. *See also Hughes v. Lieberman (In re Hughes),* 873 F.2d 262, 264 (11th Cir.1989) (rejecting attempt to satisfy §§ 727(a)(3) and (5) by placing mass of disorganized records before the court). I recognize that a difference in valuation methodology can be a satisfactory explanation for a diminution of assets when supported by evidence. *Kramer v. Poland (In re Poland),* 222 B.R. 374, 382 (finding testimony and exhibits adequately explaining loss in value as the difference between "liquidation value" on bankruptcy schedules as opposed to "full value" on financial statement). However, I find the difference between $810,000 and $35,000 of asset value to be too great to be satisfied by this explanation by the Debtor without further corroboration.

The Debtor argues that she has identified individuals from Slosberg and Young as well as her husband who have knowledge and whom she will subpoena for trial to provide testimony on this issue. Memorandum in Opposition to First Union Motion ("Mem. Opp. First Union Mot.") at 3–4; Mem. Opp. Sonders Mot. at 5. In relying on this response, the Debtor has misconstrued her burden of production both under the Bankruptcy Code and Rules. Under § 727(a)(5), merely identifying persons with knowledge will not suffice. Once the plaintiff has made out a *prima facie* case, as the Movants have here, the Debtor must come forward with a satisfactory

it is for a trial. Consequently, Rule 56(e) defects such as unsworn or uncertified affidavits, deposition testimony or unauthenticated documents, are waived and those pieces of evidence will be admissible in a summary judgment proceeding if no motion to strike has been made at the district court level. 11 James Wm. Moore *et al.,* Moore's Federal Practice § 56.14[2][c], at 56–184.1–56–185 (3d ed.2001).

Neither Sonders nor First Union challenged the authenticity of the Young Inventory and thus while it has other deficiencies as evidentiary support, I will consider its lack of authenticity waived. This evidentiary flaw was apparent in a number of the documents placed of record not only by the Debtor but by Sonders and First Union as well. In no case was an objection lodged and thus the authenticity deficiencies of these documents are likewise considered waived by Debtor.

explanation as to why her personal property is now worth only a fraction of its value four years before the Petition Date. Rule 56(e), and Bankruptcy Rule 7056 by incorporation, demand that the Debtor "must, by affidavit or as otherwise provided in this rule" set forth facts showing an issue for trial. Holding back evidence until trial is not an option where the moving party has met its burden under Rule 56. *McIntyre*, 795 F.Supp. at 673. The Debtor has not provided any affidavit or deposition testimony from either the appraisers or her husband which might raise an issue of fact that different valuation methodologies will provide a satisfactory explanation. She cannot demand trial on mere speculation that a material issue of fact *may* emerge at that time. *Frito–Lay*, 92 F.R.D. at 391.

For these reasons, I find that the Debtor has failed to satisfactorily explain the loss of approximately $775,000 worth of assets (the difference between the $810,000 represented in May 1996 and the $35,000 now claimed in her Amended Schedule B).[20]

## II. *Loss of the Stock Proceeds*

### 1. *The Charming Shoppes Proceeds*

■ The Movants have correctly noted that the Debtor made two separate sales of Charming Shoppes stock, aggregating receipts of $63,771 (the "Charming Shoppes Proceeds"), within a year of the Petition Date. Despite disclosing the sale of the

stock, the Debtor failed to account for the Charming Shoppes Proceeds in her Schedules. Amend. Statement of Fin. Affairs, ¶ 10; Amend. Sched. B. These facts are not contested by the Debtor. The Movants have thus made out a *prima facie* case under § 727(a)(5) by identifying a specific asset in which the Debtor had a cognizable interest (*i.e.,* the Charming Shoppes Proceeds) at a time not too far removed from the bankruptcy and which is now no longer available.

I find, however, that with respect to this asset the Debtor's testimony is sufficient to meet her burden of production. She testified, in relevant part, as follows:

Q: And why did you sell [15,595 shares of] that stock in February 1999?

A: It was at the request of my husband.

Q: Do you know why he requested you do that?

A: He needed the money.

Q: And did you give that $50,140 [representing the proceeds from the 15,595 shares] to him?

A: Yes

Debtor's Dep. at 71–72. At this point, the Court is not concerned with whether such a transfer to her husband was proper. My inquiry under § 727(a)(5) is only whether the explanation satisfactorily describes what happened to this asset. With regard to the February 1999 proceeds, her testimony satisfactorily explains the disposition

**20.** First Union also alleges that, while the Debtor's Amended Schedules show only $523 in cash holdings, prior to the Petition Date, she and her husband represented to various financial institutions that they had cash holdings between $50,000 and $70,000. First Union Mem. at 8. In support of this allegation, First Union simply points to a mass of financial statements and handwritten notes which appear to span the time period 1987 to 1999, Ex. MMM–6 to Debtor's Dep., making no attempt to explain how it reaches the amount of $50,000 to $75,000 or to identify when the Debtor allegedly represented herself as having these cash holdings. As noted above, it is not for this Court to make sense out of a mass of disorganized records to evaluate a party's position. Thus with respect to the alleged loss of cash, I find on this record that First Union has failed to identify an asset with sufficient specificity so as to trigger the Debtor's duty to explain.

of the $50,140, namely that she transferred the proceeds to Mr. Mezvinsky.

The Debtor's deposition testimony as to the January 2000 sale is ambiguous when read in conjunction with her earlier testimony:

> Q: [You sold] 1,847 shares of Charming Shoppes and received $13,631; is that accurate?
>
> A: To the best of my knowledge.
>
> Q: Why did you sell that stock?
>
> A: *For the same reason.*
>
> Q: And what did you do with the $13,631?
>
> A: *My husband handled it.*

*Id.* (emphasis added). The Debtor authorized the January 2000 sale of stock for the same reason as the first, because her husband needed the money. Although she fails to state as much, one could therefore infer that she also gave these proceeds to Mr. Mezvinksy. Given that I must make all inferences in favor of the Debtor and refrain from any determination as to credibility, *Boyle v. Allegheny County, Pa.,* 139 F.3d at 393, there is at least a question of fact as to whether the Debtor can provide a satisfactory explanation, that she did in fact transfer the proceeds from the second sale of the Charming Shoppes to her husband.[21]

### 2. *The Misc. Stock Proceeds*

█ First Union also presented brokerage account statements showing that, on January 7, 2000, the Debtor sold ten shares of General Electric stock and seventy-one shares of PNC Bank Stock for $1,382.61 and $2,772.98, respectively (col-

lectively the "Misc. Stock Proceeds"). Ex. MMM–24 to First Union Mot. The sale of this stock is not disclosed in the Debtor's Amended Statement of Financial Affairs, nor are the Misc. Stock Proceeds accounted for in her amended schedules. First Union has thus made out a *prima facie* case by showing the Debtor's cognizable interest in the Misc. Stock Proceeds of $4,155.59 as of January 7, 2000, which the Debtor no longer possesses.

The burden now shifts to the Debtor to satisfactorily explain the loss of the Misc. Stock Proceeds. The Debtor, however, fails to address the Misc. Stock Proceeds in her opposition to the First Union Motion. Indeed, her deposition testimony is that she has no recollection of ever having owned or sold the General Electric or PNC Bank stock. Debtor's Dep. at 163–65. In light of the account statements evidencing otherwise, I find that the Debtor has failed to satisfactorily explain the loss of the Misc. Stock Proceeds, totaling $4,155.59.

### III. *Loss of Inheritance*

█ First Union alleges that, although the Debtor disclosed a beneficial interest in the estate of her deceased mother, Mildred Margolies, estimated at $7,500 in her Amended Schedule B, her interest in the estate should have been much greater. First Union Mem. at 12. First Union relies upon account statements from brokerage accounts held by Mildred Margolies and showing that (1) Mrs. Margolies had investments worth $257,156.31 as of December 31, 1998, (2) that the accounts

---

**21.** I acknowledge First Union's argument that the Debtor's testimony appears somewhat inconsistent, namely that it appears that the Charming Stock Proceeds from the January 2000 sale may have been wired directly to the account of her mother, Mildred Margolies. Debtor's Dep. at 160–61. There was no question or testimony, however, as to whether Mr. Mezvinsky had access or control over this account. This simply raises an additional issue of material fact as to whether she can provide a credible and satisfactory explanation.

were liquidated at some point thereafter for $312,864.28, and (3) that only $1,732.47 remained as of December 31, 1999. Exs. MMM–19, MMM–20. to Debtor's Dep.

■ These documents fail to prove First Union's point. Under Pennsylvania law, "an interest in property established by a will takes effect at the time of the testator's death unless the testator expresses a contrary intent." *Doyle v. U.S.,* 358 F.Supp. 300, 305 (E.D.Pa.1973) (construing Pennsylvania law). *See also In re Kenin's Trust Estate,* 343 Pa. 549, 555, 23 A.2d 837, 840 (1942) (all wills are ambulatory and become effective only when the will's maker dies). The relevant inquiry then is what property interest did the Debtor have at the time of her mother's death? Here, First Union has neglected to mention, much less provide evidentiary support, as to (1) when Mrs. Margolies died in order to establish when the Debtor had a cognizable interest in her estate; or (2) what the value of that estate was at the time of her death. The Debtor's testimony, however, indicates her mother passed away sometime in the year 2000. Debtor's Dep at 68. Her death then occurred *after* the time that the account was liquidated and before the time the Debtor's interest attached to it. It is irrelevant that Mrs. Margolies' accounts may have been liquidated at a time when the Debtor had no property interest in those accounts. With regard to the inheritance, First Union has failed to meet its initial burden of production under § 727(a)(5), namely showing that the Debtor had a cognizable property interest in an identifiable asset not too far removed from the Petition Date which she no longer possesses.

## IV. *Loss of the Personal Loan Assets*

■ First Union correctly notes that the uncontested facts show that the Debtor and her husband borrowed the Personal Loan Assets aggregating $1,477,500 between 1997 and 1999.[22] It is likewise undisputed that the Personal Loan Assets are not accounted for anywhere in her bankruptcy schedules. Thus, First Union has made out a *prima facie* case by showing the Debtor had a cognizable interest in the Personal Loan Assets at a time not too far removed from the Petition Date which she no longer possesses.

The burden of production now shifts to the Debtor to provide a satisfactory explanation as to the loss of or deficiency in the Personal Loan Assets. The Debtor's testimony is that, "to the best of [her] recollection," $27,500 was used for general living expenses. Rule 2004 Exam at 147. General and vague assertions that money was spent on living expenses, however, are insufficient under § 727(a)(5) absent documentary corroboration. *Carter,* 236 B.R. at 181. *See also First Texas Savings Ass'n v. Reed (In re Reed),* 700 F.2d 986, 993 (5th Cir.1983) (debtor's explanation that $19,586 was consumed by business and household expenses and gambling debts was unsatisfactory). Here, the Debtor has failed to present *any* corroboration to support her assertion that $27,500 was used for living expenses. Moreover, even given my discretion to assume a portion of the Personal Loan Assets was applied to living expenses, I will not do so here given that the disposition of the overwhelming bulk of $1.4 million remains shrouded in mystery. *Compare Prentiss v. Gagnon (In re Gagnon),* 40 B.R. 951, 952–53 (Bankr.D.Maine 1984) (allowing $3,000 to $3,500 to be attributed to

---

**22.** The Debtor concedes that these loans were made to her and her husband. *See supra* n. 10.

living expenses without corroboration where debtor accounted with specificity for almost $15,000 of the $18,000 in question).

Other than the foregoing, the Debtor's testimony regarding the Personal Loan Assets is either that (a) she lacks knowledge as to how the assets were used or (b) her husband handled her financial affairs. Rule 2004 Exam at 148–49, 152–55, 209. "[T]he law, [however,] forbids the debtor from absolving himself of the responsibility of explaining the loss ... by merely pointing the finger at another." *Chusid,* 1998 WL 42292 at *5 (rejecting as insufficient under § 727(a)(5) the debtor's assertion that his son handled all his finances); *Cook,* 146 B.R. at 942 (rejecting debtor's attempt to blame bookkeeper for inadequate records and thus his inability to explain loss of assets).[23]

■ Finally, the Debtor asserts in her opposition brief that her husband will be subpoenaed to testify at trial and will be able to provide explanations as to what happened to the Personal Loan Proceeds. Mem. Opp. First Union Mot. at 6. This assertion, as noted above, disregards her burden of production at this stage. Once a plaintiff establishes a *prima facie* case of lost assets under § 727(a)(5), as First Union has here, the Debtor is obligated to provide a satisfactory explanation. Moreover, since First Union has met its burden in the context of a summary judgment motion, the Debtor cannot simply defer her response until trial. She must provide that explanation, with evidence, here and now. *McIntyre, supra,* 795 F.Supp. at 673; *Frito–Lay,* 92 F.R.D. at 391. Here,

the Debtor has failed to·do so and accordingly there is no basis for trial on this issue.

### V. *Loss of Interest Under Deed of Trust*

■ First Union alleges, that on August 22, 1997, the Debtor executed an Irrevocable Deed of Trust, under which the Debtor's husband, as settlor, was to transfer certain undisclosed assets to the trust created by this document (the "Trust") and under which the Debtor was a beneficiary and co-trustee. First Union Mem. at 14–15. The Debtor authenticated her signature on the Deed of Trust, but lacked any recollection and denied understanding what the document was. Debtor's Dep. at 173–75.

Although the Deed of Trust states that the settlor will transfer assets listed in "Schedule A," to the Trustees, there is no such schedule attached to the Deed of Trust. Ex. MMM–28 to Debtor's Dep. Nor has First Union provided any evidence that any assets were, in fact, ever deposited into the Trust. If there is no trust res, the trust never comes into existence. *In re Cavalier,* 399 Pa.Super. 637, 582 A.2d 1125, 1127 (1990). Absent evidence of a specifically identifiable asset, First Union has failed to make out a *prima facie* case under § 727(a)(5) with regard to the Trust.

### VI. *The Senate Financial Statement Assets*

The Movants have shown that in latter

---

**23.** Debtor supports her response by reference to the U.S. Attorney's indictment against her husband: "It is clear from the allegations of that indictment that the funds at issue were handled by Edward Mezvinsky." Mem. Opp. First Union Mot. at 5–6 and Ex. A to Sonders Motion. While there is no evidentiary challenge to use of this hearsay document, *see*

*Ruffalo's Truck Serv. v. National Ben–Franklin Ins. Co.,* 243 F.2d 949, 953 (2d Cir.1957), it nonetheless does nothing to advance her cause. The purpose for which the indictment is offered, to prove that the Debtor's husband handled the loan proceeds in which she had a joint interest, is still an insufficient explanation of what happened to them.

part of 1999 [24] and on February 25, 2000, the Debtor filed the Senate Financial Disclosure with the United States Senate in connection with her candidacy for Senate,[25] disclosing the ownership interest by her, her husband or dependent child in various securities and notes receivable valued at least at $1.3 million (the "Senate Financial Disclosure Assets"). Ex. "E" to Sonders Mot. The Debtor admits to signing these statements, although she asserts, and the Court takes this assertion as true for these purposes, that her husband prepared the statements and that she did not verify the accuracy of the statements before signing them. Rule 2004 Exam at 171–75. It is undisputed that the Senate Financial Disclosure Assets are not listed or accounted for in the Debtor's Schedules or Statement of Financial Affairs. Thus, The Movants have made a *prima facie* case under § 727(a)(5), namely that the Debtor has at a time proximate to the filing of the Petition presented herself to be worth more than she has represented in her bankruptcy papers.

The burden now shifts to the Debtor to provide a satisfactory explanation for the disposition of the Senate Financial Disclosure Assets. Turning to her deposition testimony, her sole explanation is that her husband handled her finances and prepared the Senate Financial Disclosure.[26] Rule 2004 Exam at 173. As discussed above, mere identification of an individual with knowledge is wholly insufficient to meet the burden under both § 727(a)(5) and Bankruptcy Rule 7056. I therefore find that the Debtor has failed to satisfac-

torily explain the disposition of the Senate Financial Statement Assets, valued at over $1.3 million.

## VII. *The Ivory Coast Assets*

The Movants allege that, five months before the Petition Date, the Debtor and her husband made representations in a "Settlement Agreement" with First Union that the Mezvinskys had substantial assets in the Ivory Coast of Africa worth at least $460,000 (the "Ivory Coast Assets"). Ex. "F" to Sonders Mot.

The Settlement Agreement, however, is simply too vague and unclear to make out a *prima facie* case for the Movants. The referenced portion of the Settlement Agreement simply states that: "The Mezvinskys have a right, title and interest in the Ivory Coast Funds and that the amount of such funds is sufficient to satisfy their payment obligations *as set forth in paragraph 4* of this Agreement." Ex. "F" to Sonders Mot. at ¶ 11(c); Sonders Mem. at 13 (emphasis added). Paragraph 4, in turn, gives the Mezvinskys the option of paying either: (1) $100,000 on or before September 30, 1999; or (2) $120,000 at any time between October 1–31, 1999, plus interest at a daily per diem rate of $25.97, beginning October 1, 1999; or (3) $120,000 at any time between November 1–30, 1999, plus interest at a daily per diem of $28.33, beginning October 1, 1999; or (4) $130,000 at any time between December 1–31, 1999, plus interest at a daily per diem of $30.69, beginning October 1, 1999. Ex. "F" to Sonders Mot. at ¶ 4(b). It would thus

---

24. The first page of the statement is dated by the Debtor on August 15, 1999, but the date and time stamp from the Senate indicates receipt on October 29, 1999. Ex. "E" to Sonders Mot.

25. Such disclosure, made under penalty of civil and criminal penalty for knowingly and willfully filing false testimony, is required pur-

suant to the Ethics in Government Act of 1978, as codified, 5 U.S.C. app. 4, § 101 et. seq.

26. The Debtor fails to address these assets whatsoever in her memoranda opposing the First Union and Sonders Motions.

appear that, at most, the Settlement Agreement shows that the Mezvinskys represented that the Ivory Coast Assets were sufficient to cover an obligation of approximately $132,760 ($130,000 principal plus $30.69 times 90 days). This is a far cry from the $460,000 representation asserted by the Movants.

Nor does the Settlement Agreement's definition of "Ivory Coast Funds"—as "all funds from investments in the Ivory Coast" in which the Mezvinskys have any legal or equitable interest—help meet Movants' burden under § 727(a)(5) of showing a "specifically identifiable" asset. Moreover, the definition includes a space for insertion of a bank name and account number which was never filled in, raising questions as to whether the exhibit is in fact the final agreement between the parties. Ex. "F" ¶ 10(e). The Movants have failed to make out a *prima facie* case with respect to the Ivory Coast Assets.

### VIII.  *Transfers to Roberta McClean*

■ The Movants also allege that the Debtor has failed to satisfactorily explain the loss of the McClean Payments totaling $12,500. First Union Mem. at 15; Sonders Mem. at 13–14. This argument is without merit. The Court's concern under § 727(a)(5) is solely a matter of identifying where assets went, not whether the transfer of assets was proper. There is perhaps no better an explanation as to where specific funds went than a check which clearly identifies a payee. In short, Movants' own allegation provides a satisfactory explanation as to where the funds went; if they existed, they went to Roberta McClean.

### IX.  *The Chasen Proceeds*

■ Finally, as it is unclear from his motion whether Sonders is raising the Chasen Transaction in the context of his § 727(a)(5) argument or simply characterizing it as a fraudulent conveyance, I address it briefly herein. As noted above, the Debtor disclosed the Chasen Transaction in her Amended Statement of Financial Affairs and explained in discovery that the Chasen Proceeds were paid by Ms. Chasen directly to Northfield Mount Herman School, the school attended by the Debtor's son, Andrew. Sonders Mem. at 14–15 (citing Debtor's response to Interrogatories). Sonders does not present any evidence, or even allege, that the Chasen Proceeds did not in fact go to Northfield Mount Herman School. As my inquiry at this point is solely whether the Debtor's explanation satisfies the Court as to *where* the proceeds went, not whether the payment to the school was a fraudulent transfer under the Code, I find that Sonders' own averments and supporting evidence are a satisfactory explanation under § 727(a)(5) as to the disposition of the Chasen Proceeds.

### CONCLUSION

Sonders and/or First Union [27] have established that: (1) the Debtor represented she and her husband to have furnishings, art and other tangible personal property worth $810,535 as of May 1996; (2) the Debtor represented the value of this category of personal property to be only $35,434 in her bankruptcy schedules; (3) the Debtor borrowed $1,477,500 within two to three years of the Petition Date; (4) these loan proceeds are not accounted for in her bankruptcy schedules; (5) the Debtor made representations in August 1999

---

**27.** Sonders and First Union have proven that the Debtor has failed to satisfactorily explain the loss of tangible and intangible personal property of approximately $2.0 million. First Union has also proven that the Debtor has failed to satisfactorily explain the loss of loan proceeds and miscellaneous stock of another $1.5 million.

and February 2000, pursuant to federal disclosure laws, regarding the ownership by her, her husband and dependent children of securities and note receivables valued at over $1.3 million; (6) the Debtor's bankruptcy schedules failed to identify any interest in these assets; (7) the Debtor owned and sold stock for $4,155.59 on January 7, 2000; and (8) the Debtor's bankruptcy statements and schedules failed to identify the sale or disposition of these assets.

The above facts are not disputed, and they established a prima facie case under § 727(a)(5), placing the burden upon the Debtor to provide a satisfactory explanation for the loss of or deficiency in these assets. The Debtor's responses have failed to set forth specific facts showing there is a genuine issue for trial, namely her ability to provide a satisfactory explanation. Moreover, her reliance on a proffer that the witnesses she intends to call at trial will provide satisfactory explanations, is insufficient to defeat the entry of summary judgment under Rule 56. For these reasons, I find that the Movants have met their burden of proof that there are no genuine issues of material fact regarding the Debtor's failure to explain satisfactorily the loss or deficiency of assets under 11 U.S.C. § 727(a)(5) and that they are entitled to a judgment as a matter of law.

While it is well accepted that § 727 is to be construed liberally in favor of a debtor, the benefit of the discharge nevertheless comes with the condition of complete candor with the court and creditors. The Debtor is an intelligent, highly educated and sophisticated professional person. Her background is in communications. As a journalist and author, she explained the affairs of the day to the public. As a Congresswoman, she analyzed and made determinations regarding the expenditure of public funds and this nation's budget. Yet her consistent response to questions asked by her creditors about the disposition of her assets is lack of knowledge or "my husband handled it," a mantra that is completely at odds with her public persona, background, and accomplishments. In her memoranda filed in both adversary cases, she disputes the "sophisticated" label advanced by Movants contending that "she like many women of her generation, relied upon her husband, Edward Mezvinsky, to handle the financial affairs of their family." Mem. Opp. First Union Mot. at 3; Mem Opp. Sonders Mot. at 3. To the extent that this explanation could ever be found sufficient to discharge a debtor's duty to satisfactorily explain the loss or depreciation of her assets, it certainly would not be found to do so here.[28] Debtor is not at all like the women of her generation that she seeks to identify with. She was a Congresswoman, and thereafter headed the United Nation Fourth World Congress on Women in Beijing and later

---

**28.** *Compare Wilmington Trust Co. v. Jarrell (In re Jarrell)*, 129 B.R. 29 (Bankr.D.Del.1991) (Debtor wife who was mere employee of business with no bookkeeping expertise would not be denied Chapter 7 discharge for failure to satisfactorily explain loss of assets, where debtor husband had acted as sole proprietor of business and had failed to satisfactorily explain loss of thousands of dollars of assets); *Equibank, N.A. v. Ward (In re Ward)*, 92 B.R. 644, 647 (Bankr.W.D.Pa.1988) (Denial of discharge to debtor wife on grounds that she could not explain loss of equipment used by the debtors' business was not warranted given that her sole relationship to the business was employment as a sales clerk and her testimony as to her lack of knowledge that she owned any of the equipment might lack credibility if she were a "woman of the 80's"); *First City Bank–Central Park v. Powell (In re Powell)*, 88 B.R. 114 (Bankr.W.D.Tex.1988) (Chapter 7 debtor, a housewife who took no part in conduct of husband resulting in unexplained diminution in assets of jewelry business and lack of adequate records, would be granted discharge where husband was 90% owner of company and company's officer, operator, and prime employee).

became the President of the Women's Campaign Fund. Her deference to her husband on financial matters, especially with knowledge that he was not managing them well, Debtor's Dep. at 173, is at best puzzling, and her attempts to justify her continued ignorance of her finances as gender related are inconsistent with her clear competency to discover the surrounding facts.

It is not for this Court to pass judgment on how the Debtor chose to manage her financial affairs prior to this bankruptcy case. However, when she filed for bankruptcy relief and invoked the protection of this Court, she forfeited the right to remain ignorant of the disposition of her assets. Without regard to her credibility, I must assume as true in the context of a summary judgment motion her testimony that her husband, not she, handled her financial matters without consultation with or disclosure to her of any details. However, her failure as a debtor seeking discharge to make any attempt to discover and disclose the facts surrounding the transactions put at issue by the Movants is fatal to her cause. I can only conclude that her continued ignorance and/or lack of understanding of the facts that surround the loss and deterioration of millions of dollars of assets and funds owned by her with her husband is a matter of choice. While this approach may serve her well in connection with matters in litigation elsewhere, her failure to provide a satisfactory explanation regarding the transactions at issue will preclude her from earning a discharge in this bankruptcy case. Finding that the Debtor here has not fulfilled her duty of disclosure as a debtor under the bankruptcy law, the objections of Sonders and First Union to the Debtor's discharge are granted.